UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- X

CHECKMATE.COM, INC.,                                   :

                          Plaintiff,                   :

                                                       :

                                                       :     **25-CV-03181** (JMF)

                                                       :

                                                       :     <u>DECLARATION OF ARJUN VASAN IN</u>
                                                       :     <u>SUPPORT OF DEFENDANT'S MOTION</u>
              -against-                                 :     <u>TO DISMISS, TRANSFER OR STAY</u>

                                                       :

                                                       :

                                                       :

                                                       :

ARJUN VASAN,                                           :

                          Defendant.                   :

----------------------------------------------------- X

I, **Arjun Vasan**, declare as follows:

1.  I am the Defendant in this action. I submit this declaration in support of my Motion to Dismiss, Transfer or Stay this Action. I have personal knowledge of the facts stated herein and, if called to testify, could and would competently do so.

2.  I am a resident of Cerritos, California. I have lived in California for over 25 years, including for the most of my employment with Checkmate, and when I was terminated.

3.  On or around August 1, 2023, I co-founded VoiceBite Corporation in Cupertino, California, where I lived at the time. Of the founding team, four were lifelong Californians—like me—and the fifth was from Toronto, Canada.

4. In starting VoiceBite, I initially started with code from earlier personal projects, as is common for tech startups. This code was functional, unrelated to the new AI codebase we would build. Some of this code was co-authored by my father, Vasan Varadarajan, who features in Checkmate's complaint. My father fully approved of any such use.

5. Any such personal code used in VoiceBite was properly licensed via its Confidential Information and Assignment Agreement. No code written for or shared with an active prior employer was ever used for VoiceBite.

6. In early January 2024, negotiations began for a merger with Checkmate. VoiceBite had no customers, revenue or outside investors. Essentially, the founding team was negotiating for collective employment with Checkmate.

7. The primary founders were Robert Nessler, CEO; Christopher Lam, COO, and me, CTO. We jointly negotiated the deal, with full internal transparency and advice of counsel.

8. I was not responsible for uploading disclosures and managing the data room. Whatever I was asked for, I provided. I was never asked for a code walkthrough by Checkmate. At all points I advocated for maximum transparency.

9. Negotiations occurred solely from California, with the lead Negotiator for Checkmate— Michael Bell—being a resident of Manhattan Beach, California. Bell visited us in Cupertino on January 31st, and we visited Bell at his Manhattan Beach residence on March 16, 2024. No in person negotiations happened in New York.

10. The negotiations were tense, which was expected, but Checkmate's tactics went above and beyond what I had personally experienced. These tactics included attempting to pit the founders against each other and pressuring us to part with our corporate counsel, Alan Foster, for his diligence in reviewing reps, warranties and disclosures.

11. A true and correct screenshot of Michael Bell urging us to fire Mr. Foster is Exhibit U.

12. On April 3rd, we held a tense meeting with Vishal Agarwal (Checkmate CEO) and Mr. Bell (Chief of Strategy), during which I requested the reps and disclosures be updated to ensure we could say everything was true. We had discussed that there was no infringing code, though there was some personal code that predated VoiceBite.

13. Mr. Bell responded with hostility to my requested updates. I said, "you wouldn't want us to lie, would you?". Mr. Bell responded that we had to "take that risk" and sign as is, and the documents could not be updated. Mr. Agarwal attempted to defuse the situation by stating that the purpose was to "share liability as partners" in case a former employer alleged we had stolen their code. At no point was it mentioned that Checkmate might, without 3rd party claims, make or be able to make allegations against us as individuals.

14. As we knew no code infringed on any operating 3rd party former employer, we decided that it was in our best interest to concede on this point.

15. I possess voluminous real-time text conversations between the founders discussing these very events at length, including quoting Mr. Bell and Mr. Agarwal in detail.

16. On April 10th, 2024, Checkmate and the VoiceBite founders agreed in writing that terms were finalized, in exchange for a promise of two months back pay.

17. On or about April 22nd, 2024, Checkmate broke this agreement and introduced several new documents, including the IP Acknowledgment Letter and Assignment Agreement it alleges I breached in its Complaint. No consideration was offered for these changes.

18. These documents were presented to us as benign and mutually beneficial. Specifically, we were told that the new documents created no new liability, let alone *individual* liability. A true and correct copy of a provided summary of the IP Letter is Exhibit S.

19. Mr. Foster, however, was alarmed by the new documents. He sent us a confidential memo stating that these documents were highly suspect and not benign. We brought Mr. Foster's concerns to Mr. Bell, who pressured us to reveal the memo. As the team had worked for months without pay during negotiations, we revealed excerpts of the memo to Mr. Bell, hoping to finalize the deal so the team could get back pay.

20. Mr. Foster was very upset by this disclosure, accused Checkmate of unethical conduct and told us he could not in good conscience continue and close the deal. He resigned on April 25th, and we found new counsel on April 27th to help us close the deal in time for Checkmate's imposed deadline of April 30th.

21. The merger closed on April 30, 2024, with employment for myself and my teammates starting May 1, 2024. I had by that time relocated to his family home in Cerritos, where I spent most of his employment with Plaintiff.

22. Exhibit M are true and correct excerpts from the Merger Agreement.

23. Exhibit I is a true and correct copy of the Non-Competition Agreement.

24. I was assigned to report to Mr. Bell, Checkmate's Chief of Strategy.

25. During employment, I experienced pushback and retaliation for insisting on legal and contractual compliance—including demanding the earned compensation that Checkmate seeks declaratory relief to "disentitle" me from in this Action.

26. Exhibit B is a true and correct copy of a slack conversation on my first two days at work showing Mr. Agarwal's reaction to my insistence on labor law compliance.

27. Despite this, I worked hard and with diligence to deliver Voice AI products to Checkmate's customers. I worked long hours, built substantial features, lead my team, delivered several critical demos and launched multiple live customers.

28. On or around October 23, 2024, I experienced panic attacks and exhaustion, and was admitted for in-patient treatment in Costa Mesa, California.

29. Between November 3rd to November 7th, I repeatedly requested payment of my overdue retention bonus via email. When Mr. Bell finally responded, he conditioned any discussion of payment upon my return from medical leave.

30. Under the distinct impression I was going to be terminated, I emailed a few alternate employers, one of whom would be considered a competitor to Checkmate. I disclosed my non-compete and expressed that I might have an opportunity to get out of it, alluding to potentially resigning with good reason or being fired without cause.

31. On information and belief, someone at this competitor, Lunchbox, notified Mr. Agarwal of my outreach. I did not solicit any Checkmate employees or customers, disparage Checkmate, or reveal any of its Confidential Information. Exhibit L is a true and correct copy of these emails, which are relied on by Checkmate's Complaint.

32. On November 14, 2024, Checkmate terminated me from my position while on medical leave and recovering in the Costa Mesa medical facility, citing the emails to Lunchbox.

33. I subsequently sent several emails requesting and then demanding payment of compensation earned per my employment agreements. This included cause or no cause severance of $120,000 and my $500,000 retention bonus.

34. On December 7, 2024, Checkmate's Counsel sent a "Notice of Claim" via email falsely claiming I resigned, and alleging misconduct it claimed "disentitled" me from payment of my earned and unpaid compensation. On December 20, 2024, I formally responded, rejecting the allegations and threatening legal action if the payments were not made.

35. Exhibit Y is a true and correct copy of the first Notice of Claim sent to me.

36. At no point did Checkmate engage with good faith, as required by the merger agreement. Despite asking for the documents it alleges I breached, and for evidence of damages caused by the code in question, Checkmate never provided such.

37. On January 28, 2025, I filed a Complaint against Plaintiff in the United States District Court for the Central District of California alleging various claims including wrongful termination, fraudulent inducement and breach of contract (the "California Action").

38. On January 29, 2025, I sent an ethics complaint to the General Counsel's Office at K&L Gates LLP, alleging misconduct by Attorney Ryan Q. Keech in representing Checkmate. Charles Tea III, deputy general counsel then requested supporting documents, which I supplied. A true and correct copy of this email thread is attached hereto as Exhibit G.1.

39. Hours later, Checkmate sent a "Notice of Claim" to the VoiceBite shareholders (who include me), alleging fraud and asserting forfeiture of compensation earned and owed as per the terms of our employment agreements, and of all equity pursuant to the Merger Agreement. The Notice appeared to follow the dispute resolution procedures in the Merger Agreement and was sent to the shareholder's representative. The shareholders engaged a counsel and anticipated negotiation based on this Notice.

40. Exhibit F is a true and correct copy of the Notice to the VoiceBite shareholders.

41. Exhibit H is a true and correct copy of the shareholder counsel response.

42. In early February conversations with my VoiceBite cofounders about Checkmate's Notice, I learned that Checkmate was planning to file a lawsuit to pre-empt my employment claims. We were unsure if this lawsuit would target me or the team.

43. Under the reasonable belief that negotiations were forthcoming, I delayed serving my California Action. Meanwhile Checkmate filed this retaliatory lawsuit in New York State Court on February 14, 2025, against me *individually* and outside the express provisions of the Merger Agreement's Dispute Resolution framework.

44. Charles Tea replied to my update request on February 17th, requesting more time, and then again on February 21st with a formal response to my ethics complaint. At no time did Mr. Tea disclose the newly filed lawsuit. Exhibits G.2-3 are true and correct copies of my ethical misconduct allegations and Mr. Tea's response.

45. I served the California Action on Plaintiff's Delaware registered agent via personal service on March 5, 2025, and filed proof of service on March 6, 2025.

46. Checkmate attempted to serve Defendant on March 5, 2025, via "nail and mail" service at my correct California residence. However, its summons erroneously identified me as residing in Sugar Land, Texas. This improper service was followed by a filing of an affidavit of service on March 7, 2025, that failed to show proper diligence.

47. A simple web search identifies the "Arjun Vasan" residing in Sugar Land, Texas to be an entirely unrelated student at the University of Texas, with no connection to this case.

48. Checkmate had on file, and had used in communications, both my correct California address as well as my brother's Midland, Texas address where I had stayed for two months during my employment.

49. Checkmate made a second attempt at service on March 13, 2025, via substitute service on my father at our family residence in Cerritos, California, where I stay now. The summons still erroneously identified me as residing in Sugar Land, Texas.

50. Exhibit Q is a true and correct copy of a recent email thread with counsel for Checkmate Ryan Q. Keech and Thomas Warns regarding service method.

51. Exhibit Z is a true and correct copy of a retraction I sent shortly after a frustrated email to counsel for Checkmate Gabriel Huey and Stacey Chiu.

52. I have not been to New York in several years and had only visited sporadically before. I have never conducted business in New York in my individual capacity.

53. I have no property in New York and has not purposefully directed activities toward New York that would give rise to the claims alleged in the Complaint.


*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Respectfully Submitted,


**Executed on**: Monday, June 2, 2025,

In Cerritos, CA

*/s/ **Arjun Vasan***

*By:* _____

**Arjun Vasan**
Defendant *Pro Se*

# EXHIBIT B

**May 1-2nd, 2024 Slack Conversation**
- DM between Plaintiff and Defendant Agarwal and
- Group Conversation between VoiceBite founders, Defendants Bell and Agarwal

arj
 4:52 PM
hey
@vishal
 i understand your policy has been BYOD. but it will be very difficult to recruit engineers with this policy, it's pretty much a standard expectation in silicon valley that you get a top of the line laptop. i'm not going to fight it now, but perhaps lets change this after raising the round.

4:53
i'm already fretting over explaining this to pranav once we are able to onboard him as a full time

vishal
 6:59 PM
Hey Arj, we have recruited over 70 engineers over the last 7 years. It won't be a problem :slightly_smiling_face:
7:00
That is why we don't have to hire from Silicon valley. We can hire from literally anywhere in the world. And it's not a small consideration - it'll be a massive outlay for the company. Remember we have over 300 employees
7:01
If this is a deal breaker for some, what we can do is offer them a one time signing bonus of $1,500 or so but overall, this has not been a problem

arj
 7:37 PM
it's a massive outlay that most of our competitors are willing to make though. i don't think doordash thinks one second about this. they want the best and to provide the best tools for the job.

vishal
 7:38 PM
Not something we are considering right now Arj. We are different than others, we don't have to do what they do and we are still able to hire and retain the best. In the last 6 years, I have not had a problem with it. And like I said, if this is an absolute problem, we can add some initial signing bonus but not in all cases. Let's make sure to keep that as a last resort
7:39
*I'm willing to compete with others on this and I'm confident we will win. If someone does not want to join us for an initial expense of a few thousand dollars, I don't think they are the right fit anyway*

arj
 7:40 PM
**in california it's not even legal though, and it's a security risk. california employers must provide the work equipment for employees.**

vishal
 7:40 PM
*That's not true*

7:40
We have hired tons of people in California

arj
 7:40 PM
yes but this is the law

vishal
 7:41 PM
It's a very serious cost consideration Arj, it can't be taken lightly

arj
 7:47 PM
https://www.employmentlawfirms.com/resources/can-my-employer-require-me-buy-my-own-laptop-work.htm
there are dozens of articles like this. it is the law, whether or not it is costly.

www.employmentlawfirms.comwww.employmentlawfirms.com
Can my employer require me to buy my own laptop for work?
Find out if employers can require employees to provide and work on their own laptops. Learn the meaning of BYOD policies and if they are legal in the workplace.

vishal
 7:47 PM
Got it

arj
 1:39 AM
even beyond this law, the types of people I want to hire are going to immediately be turned off if they knew they would have to use their personal computer for work. they will believe in strict separation between their personal projects and data and work projects and data. i know because I myself feel this way. i'm not comfortable putting monitoring software on my personal computer (neither are sam and paul, while robert and chris have voicebite computers separate from personal, so they don't mind as much). nor would we be comfortable with employer security going through our personal computer and clearing it out if we separate. nor are we ok with the possibility that our personal computers could be subpoenaed if there is a lawsuit or investigation of checkmate. all of these are real, legitimate fears and reasons not to mix work and personal.
it's also cleaner for checkmate to know it fully owns the work computer, and there is no liability, security risk etc.
instead of thinking of this as the employees getting a computer courtesy of checkmate, it would be better to think of it as an investment in checkmate employees, making sure they have the best tools for the job possible. rather than saying "If someone does not want to join us for an initial expense of a few thousand dollars, I don't think they are the right fit anyway", think of the flip side "If you aren't willing to invest a few thousand dollars in someone's productivity, are they a good fit for checkmate?"

vishal
 7:56 AM
Arj - noted on all points. Let's keep in mind that we have been running this way for 6 years with no problems in hiring and retaining employees.  You are coming on too strong on this without a realization about the larger business and cost impact. There is no intent to start providing equipment from our side as of now.
7:57

I'd like to end this conversation here for now. If anything changes in the future, I'll reconsider.

arj
 8:11 AM
So you are ok with us not installing this monitoring software.
8:13
Yes but you also did not hire the types of people i think are right for voicebite. Many great people but i need creative hackers
8:13
The cost impact for voicebite team alone is not that high

vishal
 8:14 AM
Sorry, there are no exceptions. I can't just allow for the AI team not to follow the company process or have equipment just for AI team
8:14
If you think you can't develop a great product with the company policies we have now, you are really restricting your thinking and scope

arj
 8:14 AM
Well then you have to follow california law and get us equipment to install the software on

vishal
 8:15 AM
Arj - I seriously can't continue to have this same conversation. Let's take everyone's opinion on the call we have coming up

arj
 8:15 AM
Bc we arent doing it on our personal computers as i explained above

vishal
 8:15 AM
Alright then you can't work for the company
8:15
We haven't had a problem up until now, so we are good

arj
 8:15 AM
its the law

vishal
 8:16 AM
**Alright, we can't afford to give out equipment so we won't hire people who are stickler for the law**
8:16
Is that clear?

arj
 8:16 AM
Employers have to follow the law

vishal
  8:16 AM
It's about what we can afford to do, and comparing us to DoorDash is ridiculous
8:17
Arj - I'm ending this conversation now

arj
  8:23 AM
Right so we can not install the software and you can provision us computers after the fundraiser

vishal
  10:11 AM
Noted Arjun. At this point you are just being difficult and looking to create problems rather than solutions for a company you just joined. I'm moving this conversation to the common channel so that everyone is aware. And I promise you I won't bother having a difficult conversation with you at whatever point in our journey. That is not the kind of conversation you have with a company you just joined and the tone is absolutely ridiculous

arj
  11:55 AM
why would you make this a group conversation. we could have figured it out. this is not the kind of conversation you should have with a company you just acquired either. you said before you would be empowering us.

[in group thread with my voicebite co-founders, vishal and mike]

@channel I'm moving a 1:1 conversation I am having with Arjun here, and documenting it here for everyone. Arj's point is that we need to provision equipments and computers in order to hire good engineers. And that this is also a California law. We at this point cannot do that because we have over 300 employees and that cash outlay is huge. The tone from
@arj
 is absolutely in the spirit of creating a problem and creating a confrontation, rather than having a mutual conversation and trying to find a solution with a company he just joined. I wanted to make sure everyone is aware and ask if everyone shares Arj's belief. If that continues to be the case, I won't mind having a difficult conversation with the individual at whatever stage of the company to make sure we build a cohesive company for long term benefits.
10:15
If there are any exceptions to be made with regards to installing company software, then it has to be run through Security. They are responsible for SOC2 compliance which is required to win large corporate accounts. If the individual can't comply, then they can't work with us. There is no grey area here.
10:16
Through multiple conversations, I have maintained that we cannot just decide on issuing equipments to a select group. It has to be for the entire company, and is a huge cash outlay which Arj is refusing to acknowledge and understand

arj
  10:16 AM
Yes, so buy us laptops to install the security software on

vishal
  10:17 AM
image.png

image.png

arj
  10:17 AM
Bc its an invasion of privacy
10:17
Otherwise

vishal
  10:17 AM
This is the last discussion, which is telling us what to do instead of having a constructive conversation
10:18
This is not going to be a discussion on this channel. If need be, we'll take a collective call and make a final decision. Rest of the team to chime in please

arj
  10:18 AM
Bc companies have to follow the law there are no exceptions to that either in california, just like you are saying there are no exceptions to the policy
10:19
You can double check the law, at the minimum employer has to reimburse purchase of equipment needed to do the job

Robert Nessler
  10:22 AM
I do not need a new computer and am fine without it. I did find it strange that there was no option to have a CM issued laptop that you return whenever you leave the company, but that isn't a  big deal to me.
Arjun does need more compute power and resources at his disposal but I would agree his way of going about it is not effective or tactful.  I'm not sure what the best solution moving forward is, I think we should meet with Luke and see what resources we have and then go from there.

arj
  10:23 AM
Yes but
@Robert Nessler
 has a voicebite work computer i didnt buy one
10:24
He has a separate personal computer

Chris L
  10:42 AM
I think this has blown up a little bit more than it should, but I can understand both viewpoints. Frankly speaking, I would not feel comfortable using my personal machine for work either (I like to make sure there's a separation), let alone install additional software on it. I'm not an expert on security/compliance implications, but having the physical separation is probably good for everyone. Luckily, I have a laptop from VoiceBite so I can maintain that separation.
On the other hand, I also understand the large commitment for Checkmate this represents. It wouldn't be fair to make exceptions just for the VoiceBite team as it wouldn't be fair to the rest of the employees. We also don't want to start off having the rest of the company look at us and wonder why we got special treatment with laptops, while everyone else gets neglected.

Feelings should be left aside, and we should consider the facts at hand. Does Arj need more compute power - probably, and future ML engineers we bring on may too. Is this a legal issue - in California, it might very well be. Can we afford to procure laptops for everyone - no. Do we want to start making exceptions at this point - probably not. Are there alternative solutions - possibly, and we should focus on brainstorming these.

arj
  10:45 AM
its not about being fair. there's a legitimate business use case for ML engineers to have high end work comptuers

Chris L
  10:45 AM
Arj, just to double check, are you asking for a machine for your own personal use or just for work use?

arj
  10:45 AM
work use only, it's to separate work from personal
10:45
obviously. i need to have my own personal computer for personal reasons.
10:48
and also, i'm ok waiting until fundraising finishes, but in the meanwhile not OK installing monitoring software on my personal computer.

Chris L
  10:56 AM
An idea… rather than calling it an exception for Arjun, can we position this as a business need and have Luke/IT review needs on a case-by-case basis? I'm sure cases like this have come up before and this probably won't be the last. Specialized roles may require specialized tools. For example, designers may need to procure an Adobe Photoshop or Illustrator license. Or a hardware engineer may need a soldering iron and other prototyping equipment to build a new product.
:white_check_mark:
1

vishal
  11:03 AM
Hi
@Chris L

@Robert Nessler
 thank you for engaging in a more civil and professional conversation, that is what I was hoping for. Arj's tone on Day 2 is absolutely the last thing I was expecting, giving me an ultimatum. I agree, we have a situation and my main problem is the tone and confrontational nature instead of saying we are a team, let's solve this together. I have been going back and forth with Arj since last evening to try and answer his questions but there is nothing that I am saying is helping answer his question. And ultimately we are being given an ultimatum, which is not where we want to be.
When we joined the company, we knew this is a bring your own device company.
We are also talking about two different things. One is compute power for which we can absolutely provide a computer. But if we are simply asking for a company provided laptop on which you can do your basic job, that is not what we will be providing. *For the 7th time, I'm*

*repeating this - it is not funding dependent. Funding will not change this, but Arj keeps coming back to the same point.*
11:04
**I can also promise if this is how it is going to be going ahead, I'd rather cut my losses right now. No employee is indispensable and I can put that in a formal notice. This is not a problem solving approach**

arj
  11:06 AM
we understood bring your own device as relating to mobile phones
11:06
we have never heard of a tech company that does not provide work computers

vishal
  11:08 AM
*The situation is quite clear Arj - you don't want to use your personal computer for work reasons. We don't provide work computers. The only solution is for you to quit. Do you know of any other alternative?*

arj
  11:08 AM
yes you buy me a work computer so we can win voice ordering
11:09
that is the smart solution

vishal
  11:09 AM
Ok. And I'm saying No.
11:09
Anything else?

arj
  11:09 AM
then i'm saying no to installing monitoring software. i am not a quitter though.

vishal
  11:10 AM
**Sure, then we will consult with security and if there is no other alternative, then I am happy to fire you**
11:10
**We will resolve this one way or the other**
11:10
**And I promise you we will win Voice ordering one way or another. That is not dependent on you**

arj
  11:10 AM
I will win voice ordering one way or another
11:11
not dependent on checkmate

Robert Nessler

11:11 AM
Maybe let's calm down a bit, go for a walk and revisit this in a few hours.

vishal
 **11:11 AM**
 **Super. Next steps:**
 **Going to reach out to Security to see what the policy is. If there are no other alternatives,**
 **then we go through HR and let you go**

Chris L
 11:12 AM
Perhaps I am speaking out of line here - but I think we should all take a breather and a step
back. We've overcome much bigger issues in the past (I'm glad all the negotiation is done)
while on other sides of the table. Now we're on the other side of the table and there's
absolutely no reason we can't figure something out together
:white_check_mark:
1

vishal
 11:12 AM
Robert - I've been going back and forth in a loop since last night. I promise I'm calm, I just
don't see an answer
11:12
I'll leave it up to you guys to suggest options, I'm at the end of my rope here

Chris L
 11:12 AM
Yah, just talk to Luke. We haven't even gone down that path yet.

vishal
 11:12 AM
Chris - you are an equal partner, nothing is out of line.

Chris L
 11:12 AM
*Luke / security

vishal
 11:13 AM
Sure. Not installing the software is not an option, so I'll wait for Security to let me know
11:13
Again - to be clear, we will provide compute power whether through cloud or a separate
machine
11:13
What we will not be providing is a work laptop

arj
 **11:13 AM**
 **so you will terminate me for pointing out a violation of the law?**
 **11:13**
 **i think there are laws against that**

Chris L

11:13 AM
Well there's our solution. Talk to Luke, make a case, and see if we can get you a separate machine with more power.
:white_check_mark:
1

vishal
 11:13 AM
Cause that has bigger implications
11:14
@arj
 **sure, if that's the route you want to go I'd rather deal with that headache than the conversation we are having here**

Chris L
 11:23 AM
I've went ahead and sent a DM with Luke/Arj. Let's try exploring this path first

vishal
 **12:32 PM**
**Noted Chris. I'm very clear on the rationale here and the final approval will have to go through me. Reposting this here**
**12:32**
**Again - to be clear, we will provide compute power whether through cloud or a separate machine**
**What we will not be providing is a work laptop**





Sorry, there are no exceptions. I can't just allow for the ~~he company process or have equipment just for AI team~~

**May 2nd at 8:14:54 AM** 't develop a great product with the company policies we have now, you are really ~~restricting your thinking and scope~~

**arj** 8:14 AM
Well then you have to follow california law and get us equipment to install the software on

**vishal** 8:15 AM
Arj - I seriously can't continue to have this same conversation. Let's take everyone's opinion on the call we have coming up

**arj** 8:15 AM
Bc we arent doing it on our personal computers as i explained above

**vishal** 8:15 AM
Alright then you can't work for the company

We haven't had a problem up until now, so we are good

**arj** 8:15 AM
its the law

**vishal** 8:16 AM
Alright, we can't afford to give out equipment so we won't hire people who are stickler for the law

Is that clear?

**arj** 8:16 AM
Employers have to follow the law

**vishal** 8:16 AM
It's about what we can afford to do, and comparing us to DoorDash is ridiculous

Arj - I'm ending this conversation now

**arj** 8:23 AM



**voicemate** ~

that is the smart solution

**vishal** 11:09 AM
Ok. And I'm saying No.

Anything else?

**arjun** 11:09 AM
then i'm saying no to installing monitoring software. i am not a quitter though.

**vishal** 11:10 AM
Sure, then we will consult with security and if there is no other alternative, then I am happy to fire you

We will resolve this one way or the other

And I promise you that we will win Voice ordering one way or another. That is not dependent on you

**arjun** 11:10 AM
I will win voice ordering one way or another

not dependent on checkmate

**Robert Nessler** 11:11 AM
Maybe let's calm down a bit, go for a walk and revisit this in a few hours.

**vishal** 11:11 AM
Super. Next steps:

1. Going to reach out to Security to see what the policy is. If there are no other alternatives, then we ~~will reach HR and let you go~~

**Chris Lam** 11:12 AM
Perhaps I am speaking out of line here - but I think we should all take a breather and a step back. We've overcome much bigger issues in the past (I'm glad all the negotiation is done) while on other sides of the table. Now we're on the other side of the table and there's absolutely no reason we can't figure something out together

✅ 1

**Chris Lam** 11:12 AM
Yah, just talk to Luke. We haven't even gone down that path yet.

Today ⌄

**vishal** 11:12 AM
Chris - you are an equal partner, nothing is out of line.

**Chris Lam** 11:12 AM
*Luke / security

**vishal** 11:13 AM
Sure. Not installing the software is not an option, so I'll wait for Security to let me know

Again - to be clear, we will provide compute power whether through cloud or a separate machine

What we will not be providing is a work laptop

**arjun** 11:13 AM
so you will terminate me for pointing out a violation of the law?

11:13 i think there are laws against that

✅ 👀 🙌 😀 💬 ➦ 🔖 ⋮

**Chris Lam** 11:13 AM
Well there's our solution. Talk to Luke, make a case, and see if we can get you a separate machine with more power.

✅ 1    😀

**vishal** 11:13 AM
Cause that has bigger implications

@arjun sure, if that's the route you want to go I'd rather deal with that headache than the conversation we are having here

**Chris Lam** 11:23 AM
I've went ahead and sent a DM with Luke/Arj. Let's try exploring this path first

# EXHIBIT F



January 29, 2025

Ryan Q. Keech
Partner
Ryan.Keech@klgates.com

T +1 310 552 5070
F +1 310 552 5001

**VIA ELECTRONIC MAIL ONLY**

Robert Nessler (as Holder Representative)
1149 Hollyhead Lane
Cupertino, California 95014
robertnessler@gmail.com

Re:    **VoiceBite Corporation/Indemnification Notice of Direct Claim**

Dear Holder Representative:

Reference is made to that certain Agreement and Plan of Merger, by and among Checkmate.com Inc. ("Purchaser"), VoiceBite Merger Sub, Inc., VoiceBite Corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative"), dated as of April 30, 2024 (the "Merger Agreement"). Capitalized terms not otherwise defined herein have the meaning set forth in the Merger Agreement.

Pursuant to Section 8 of the Merger Agreement and in accordance with Section 8.3(c) of the Merger Agreement, Purchaser and certain indemnified affiliates, as those terms are defined (collectively, "Purchaser Indemnified Parties"), hereby provide to you, in your role as Holder Representative, this notice of Direct Claim and indemnifiable Losses with respect to certain matters under the Merger Agreement.

\*       \*       \*

Following the Closing, Purchaser Indemnified Parties were made aware of serious conduct involving, *inter alia*, breaches of certain representations and warranties made by the Company and its affiliates, which breaches resulted in Losses to Purchaser. Although Purchaser's investigation is ongoing, Purchaser has determined that the Company and/or certain of its affiliates knowingly, willfully and fraudulently breached at least the following representations and warranties made by it in the Merger Agreement, resulting in significant damages and other Losses to Purchaser (collectively, the "Subject Claims"):

- Section 5.7, Title to and Sufficiency of Assets
- Section 5.9, Intellectual Property
- Section 5.19, Disclosure

K&L GATES LLP
10100 SANTA MONICA BOULEVARD   EIGHTH FLOOR   LOS ANGELES   CA 90067
T +1 310 552 5000  F +1 310 552 5001  klgates.com

508938408.2

Collectively and put simply, the Purchaser Indemnified Parties have suffered Losses arising from material misrepresentations and fraud relating to the authorship, licensing and ownership of Company software and other key intellectual property. The Subject Claims constitute indemnifiable Losses pursuant to Section 8.1(a) of the Merger Agreement, in each case paid, incurred, suffered or sustained by Purchaser and the Surviving Corporation, as Indemnified Parties with respect to the foregoing.

As you know, pursuant to Section 8.1(a) and Section 8.3(c) of the Merger Agreement, the Holder Indemnifying Parties are obligated to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Purchaser Losses arising out of, or relating to certain matters, including, without limitation, any inaccuracies in or breach of the Company's representations and warranties. As provided in Section 8.5(a) of the Merger Agreement, any limitation on the amount of indemnification payable by any Pre-Closing Holder shall not apply in the event of Fraud by the Company.

While the Purchaser Indemnified Parties' investigation is ongoing, the Purchaser Indemnified Parties state that Purchaser Losses comprising the Subject Claim is an amount in excess of **$5,000,000**. For purposes of this indemnification claim only, Purchaser Indemnified Parties are making an indemnification claim for Purchaser Losses of **$1,681,815** and expressly state and do not waive non-indemnification claims that include and/or are in excess of these amounts.

Purchaser shall seek recourse for the Indemnifiable Amounts as set forth below:

- Forfeiture of Final Payment Amounts (as defined in the Bonus Agreement): $**200,000**

- Surrender of 321,199 Purchaser Closing Shares: $**131,815**

- Forfeiture of Retention Bonus amounts (as defined in the Bonus Agreement): $**1,350,000**

This Indemnification Claim Notice is a Notice of Claim as set out in Section 8.3(c) of the Merger Agreement.

Nothing herein is intended to be, nor should it be construed as, a waiver or limitation of any of the Purchaser Indemnified Parties' rights, claims or defenses in this matter, all of which are and will remain expressly reserved.

If you have any questions regarding this matter, please do not hesitate to contact me.


Very truly yours,

Ryan Q. Keech

# EXHIBIT G.1

 Gmail

**Arjun Vasan <arjun.vasan@gmail.com>**

---

## Subject: Urgent Ethical Concerns Regarding K&L Gates Representation of Checkmate.com, Inc.

9 messages

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                   Wed, Jan 29, 2025 at 1:31 PM
To: jeffrey.maletta@klgates.com

Dear Mr. Maletta,

I am writing to formally raise ethical concerns regarding K&L Gates' representation of Checkmate.com, Inc. in an ongoing legal dispute. Specifically, I have identified multiple violations of the California Rules of Professional Conduct and ABA Model Rules by Attorney **Ryan Q. Keech**, acting on behalf of your firm and Checkmate.

I have attached a **formal Bar Complaint** that I intend to file on **February 1, 2025**.

Mr. Keech's actions constitute clear violations of professional ethics, including knowingly advancing falsehoods, misrepresentation, and leveraging intimidation tactics against a *pro se* party. K&L Gates has been repeatedly informed of these falsehoods yet continues to advance them in bad faith.

I strongly urge K&L Gates to conduct an **immediate internal review** and consider the reputational and legal consequences of enabling conduct that appears **obstruct justice**. If further documentation is required, I am able to provide any of the evidence referenced within the complaint.

I look forward to your prompt acknowledgment and response.

Sincerely,

**Arjun Vasan**

arjun.vasan@gmail.com

562-900-6541

---



📄 **bar-complaint-keech.pdf**
146K

---

**Tea, Charles** <Charles.Tea@klgates.com>                                 Fri, Jan 31, 2025 at 8:14 AM
To: "arjun.vasan@gmail.com" <arjun.vasan@gmail.com>

Mr. Vasan:

I am the Deputy General Counsel of K&L Gates LLP and am writing in response to your email below and attached draft bar complaint. Although the draft bar complaint references certain attached evidence, no attachments or other referenced evidence was provided. If there are additional materials you would like us to consider, please provide them. Thereafter, we will undertake a review of the allegations and be back in touch with you once our review is complete.

Regards,

Charles Tea

**Charles M. Tea**
Deputy General Counsel
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: 412.355.6256
Fax: 412.355.6501
charles.tea@klgates.com
www.klgates.com

---

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Wednesday, January 29, 2025 4:31 PM
**To:** Maletta, Jeffrey <Jeffrey.Maletta@klgates.com>
**Subject:** Subject: Urgent Ethical Concerns Regarding K&L Gates Representation of Checkmate.com, Inc.

---

[Quoted text hidden]

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Charles.Tea@klgates.com.-4

---

 **bar-complaint-keech.pdf**
146K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                          Fri, Jan 31, 2025 at 8:15 AM
To: "Tea, Charles" <Charles.Tea@klgates.com>

Mr. Tea,

Will send shortly. Thank you for your attention to this matter.

- Arjun Vasan

Sent from Gmail Mobile
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                          Fri, Jan 31, 2025 at 10:43 AM
To: "Tea, Charles" <Charles.Tea@klgates.com>

Mr. Tea,

Please see attached the following:

1. Nov 12-14, 2024 email thread surrounding my termination, including the scheduling of the call at 8AM on Nov 14.
2. Screenshots of the termination meeting proving termination.
3. Dec 6th, 2024 Notice of Claim from Ryan Keech of K&L Gates claiming that I "resigned" on the 13th, quoting the November 14th "good reason" email.
4. Jan 22nd, 2025 Second Notice from Keech, omitting any claim of resignation and referencing my "termination".
5. April 22nd, 2024 "IP Letter" summary provided by Checkmate, quoting K&L Gates attorneys.

6. Dec 20th, 2024 email from Keech threatening to compel disclosure of material reasonably assumed by me to be privileged and further made while i was in a medical facility.
7. Final redline of the "IP Letter" (Trade Secret Acknowledgement) document provided by VoiceBite counsel on the day prior to closing the merger.

Thank you once again for your attention to this matter. I will hold off on the formal bar complaint pending your internal review.

Sincerely,
- Arjun Vasan

[Quoted text hidden]

---

**7 attachments**


**keech-privilege-disclosure.png**
468K


**Exhibit-H-Nov-12-Email.pdf**
323K


**Exhibit-K-Termination-Meeting-Screenshots.pdf**
2915K


**notice-of-claim-redacted.pdf**
188K


**notice-of-claim-2.pdf**
275K


**Exhibit-S-IP-Letter-Summary-PDF.pdf**
241K


**ip-letter.pdf**
80K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                   Fri, Feb 14, 2025 at 2:55 PM
To: "Tea, Charles" <Charles.Tea@klgates.com>

Mr. Tea,

Has K&L Gates concluded its investigation of this matter? Please advise if not, or if so, what the outcome was. Additionally, please confirm whether any remedial actions were taken in response to the concerns raised.

I look forward to your response.

Best regards,

Arjun Vasan

[Quoted text hidden]

---

**Tea, Charles** <Charles.Tea@klgates.com>                               Mon, Feb 17, 2025 at 11:28 AM
To: Arjun Vasan <arjun.vasan@gmail.com>

Mr. Vasan:

I continue to review your allegations, though have been tied up of late with some time sensitive matters. I expect to be able to get back to you reasonably soon. I appreciate your patience.


Regards,


Charles Tea

[Quoted text hidden]
[Quoted text hidden]

---

**Tea, Charles** <Charles.Tea@klgates.com>                    Fri, Feb 21, 2025 at 9:19 AM
To: Arjun Vasan <arjun.vasan@gmail.com>

Mr. Vasan:


Please see the attached letter.


Regards,


Charles Tea

[Quoted text hidden]
[Quoted text hidden]

---

 **Letter to Arjun Vasan.pdf**
305K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Fri, Feb 21, 2025 at 8:02 PM
To: "Tea, Charles" <Charles.Tea@klgates.com>

Mr Tea:

I note that you have failed to substantively address my allegations, including the clearly fabricated resignation date. While I do not know KL Gates' role in altering the date, I do know that your firm has not and has refused to retract the date.. again this is noted.

I will be proceeding the bar complaint and use this non-response in future legal proceedings.

Best regards,
-Arj


Sent from Gmail Mobile
[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                    Fri, Feb 21, 2025 at 8:47 PM
Draft To: "Tea, Charles" <Charles.Tea@klgates.com>


Sent from Gmail Mobile

# EXHIBIT G.2

Office of Chief Trial Counsel

The State Bar of California

845 S. Figueroa Street

Los Angeles, CA 90017-2515

**Subject**: Formal Complaint Against Attorney Ryan Q. Keech and K&L Gates LLP for Ethical Violations

Dear Office of Chief Trial Counsel,

I am submitting this formal complaint against Attorney Ryan Q. Keech and the law firm K&L Gates LLP ("Respondents") for engaging in a pattern of ethical misconduct in their representation of Checkmate.com, Inc. ("Checkmate"). The misconduct includes knowingly advancing false claims, facilitating bad faith tactics, and engaging in behavior that violates multiple provisions of the California Rules of Professional Conduct and the ABA Model Rules of Professional Conduct.

**Case Overview**

This complaint stems from an employment dispute between myself and Checkmate; where I was employed pursuant to a merger with my startup VoiceBite. I was owed a substantial sum, including over $120,000 in severance, payable on termination, whether with cause or without; in addition to other sums.

**1. Termination & Advancement of a False Resignation Claim**

I was terminated on an **8AM** Zoom call with the company's CEO, Chief of Strategy and VP of Human Relations, on ***November 14, 2024***, purportedly for violating a non-solicitation agreement. The company offered to negotiate a "final settlement" with me directly. I sent several emails requesting my severance and as well as overdue retention bonus payments.

Three weeks later, on **December 6, 2024**, K&L Gates issued a Notice of Claim on behalf of Checkmate falsely stating, amongst other claims, that I had "resigned" from my position on **November 13, 2024**. This assertion is demonstrably false, as my employment was terminated by Checkmate, I did **not** voluntarily resign.

I was explicitly terminated by three top executives of the company while in an inpatient medical facility, without access to an attorney or my employment agreement. The phrasing used was clear, explicit and left no doubt that I was "completely terminated", "with immediate effect" "right now", "right this second"; repeated multiple times for clarity. Two hours *after* I was terminated, I sent a "good reason" resignation email, in distress, as an attempt to protect my rights.

The date is highly significant, as all three executives were on the email thread — which began prior to and carried on after my termination—and were aware that this "resignation" email was sent on **Nov 14** at 9:56AM. Checkmate, through K&L Gates, took advantage of my distress to claim I "resigned" and deny me severance.

Attached evidence includes:

- Email correspondence leading up to my termination, including my "good reason" email on *November 14, 2024*, disputing any voluntary resignation.
- Initial Notice of Claim issued by K&L Gates on December 6, 2024, which rejects my "good reason resignation" to deny my severance.
- The subsequent Notice of Claim issued by K&L Gates on January 22, 2025, which omits the resignation claim and references my "termination."

I have since repeatedly mentioned I have lawfully obtained video evidence of my termination, in the presence of three top executives of the company. However,

K&L Gates, on behalf of the company, has not explicitly acknowledged or retracted this claim. I have still not received my contractual severance.

This false claim has caused significant professional and reputational harm, has been used to justify withholding compensation owed to me, and constitutes a breach of ethical obligations under:

- **Rule 3.3**: Duty of candor to tribunals and others.
- **Rule 4.1**: Truthfulness in statements to others.
- **Rule 8.4(c)**: Prohibition against conduct involving dishonesty, fraud, deceit, or misrepresentation.

I request an investigation into the origin of this knowingly false claim and disciplinary action against Respondents for advancing it.

## 2. Misuse of the "Joint Defenses" Summary of K&L Gates' IP Letter

During merger negotiations, just prior to close, Checkmate surprised us with new agreements including a "Trade Secret Acknowledgment" letter ("IP Letter") drafted by K&L Gates. Checkmate sensed our hesitation, and shared a "summary" purportedly authored by K&L Gates, clearly and falsely framed as in our "joint interest" and as a protective measure for all parties, presented by Checkmate Chief of Strategy Michael Bell as follows:

> The firm, KL Gates, advised us that a stand alone letter could provide additional protection in the event we find ourselves in litigation with a prior employer. They explained the letter like this:
>
> > "*The Holders and the Company have a joint interest in insulating themselves against the prospect of liability in any potential lawsuit arising from the potential misappropriation of trade secrets or other intellectual property.... It provides a means by which the Holders and*

> *the Company will be able to jointly argue, in the event any such suit is brought, that the plaintiffs cannot make a showing of improper acquisition – thus requiring dismissal.*"

Despite this framing, the letter was later weaponized against me, personally, in Checkmate's Notices of Claim, suggesting a clear misrepresentation or material omission by K&L Gates at the time of its issuance. If K&L Gates either failed to conduct due diligence on the implications of their summary or knowingly allowed it to be used to misrepresent the IP Letter's purpose, this constitutes a violation of:

- **Rule 1.4**: Duty of communication.
- **Rule 4.1**: Truthfulness in statements to others.

I request that the California State Bar investigate whether K&L Gates knowingly facilitated the misrepresentation or failed to correct its misuse.

### 3. Threat to Compel Disclosure of Privileged Communications

The Notice was sent to former VoiceBite counsel—who had represented the company to close the merger, not me personally—but from whom I was getting informal advice, unaware of his potential conflict of interest. The company's executives were well aware of the conflict, having intimately participated in the merger—and being much more sophisticated in such matters.

On December 20th, 2024, I formally responded to the Notice, rejecting the claims, and establishing that I would represent myself while I sought counsel. Mr. Keech of K&L Gates, distressingly, threatened to compel the disclosure of these communications, despite being fully aware that they began and mostly occurred while I was in a medical facility, and under the reasonable assumption of privilege. This unethical attempt to intimidate and harass me violates:

- **Rule 4.4(a)**: Prohibition on using means that have no substantial purpose other than to embarrass, delay, or burden a third person.
- **Rule 1.6**: Duty to maintain confidentiality and respect the attorney-client privilege of third parties.

Given the severity of this violation, I request an immediate review of whether K&L Gates knowingly participated in coercive legal tactics designed to breach privilege.

I have attached the relevant email thread.

## 4. Misrepresentation of Agreement Excerpts

Mr. Keech, on behalf of Checkmate, has repeatedly manipulated excerpts from documents—the executed versions of which the company refuses to provide—to establish obligations that do not match the versions that I was provided just prior to signing by VoiceBite counsel. I have provided one such example below:

Consider the following from both Notices:

> That you would "not bring onto [VoiceBite]'s premises" any "property belonging to a former employer or any other person to whom I have an obligation of confidentiality unless that former employer or person has consented in writing" (Vasan Trade Secret Acknowledgement);

Compare to the following from the pre-signing version that I have:

> I acknowledge the obligation regarding use of prior employers' confidential information set forth in Section 1.4 of the Employee Confidential Information and Inventions Assignment Agreement that I have entered into with Checkmate, which is excerpted below:
>
> > **1.4 No Improper Use of Information of Prior Employers and Others**.… I will not bring onto <u>Company's</u> premises any unpublished documents or property belonging to a former employer

Despite my bringing attention to this error multiple times, Mr. Keech has yet to correct it, or to provide the executed documents.

**Ethical Violations and Requested Relief**

The pattern of misconduct by K&L Gates demonstrates a clear disregard for ethical obligations and professional integrity—especially when dealing with a *pro se* party. Specifically, I request the following actions from the California State Bar:

1. **Formal investigation** into K&L Gates' advancement of the false resignation claim, misuse of legal documents, and intimidation tactics.
2. **Sanctions** or disciplinary measures against Attorney Ryan Q. Keech and K&L Gates LLP for professional misconduct.
3. **A finding of ethical violations**, which may serve as supporting evidence in ongoing legal proceedings.

Please confirm receipt of this complaint and inform me of the next steps in the investigation process. I am able to provide additional evidence or supporting documentation or further information as needed.

Sincerely,

Arjun Vasan
arjun.vasan@gmail.com
562-900-6541

# EXHIBIT G.3



February 21, 2025

Charles M. Tea III
charles.tea@klgates.com

T 412 355 6256
F 412 355 6501

<u>**Via Electronic Mail Only**</u>

Arjun Vasan
arjun.vasan@gmail.com

**Re:    <u>Arjun Vasan / K&L Gates and Ryan Keech</u>**

Dear Mr. Vasan:

I am the Deputy General Counsel of K&L Gates and write in response to the email you sent to our Firm's General Counsel, Jeffrey Maletta, dated January 29, 2025.  That email attached a draft complaint you indicated you intend to file with the State Bar of California in which you assert alleged grievances against our Firm and Ryan Keech, a lawyer with our Firm.  We appreciate the opportunity to respond.

Please know that we take very seriously any alleged grievances asserted against our Firm and any of our lawyers, as we are committed to the highest standards of professionalism and ethical behavior.  We have undertaken a thorough review of the allegations contained in your draft complaint and, respectfully, have concluded they are wholly without merit.

For context, you are not a client of K&L Gates.  Rather, you are adverse to our Firm's client, Checkmate.com Inc., in an ongoing dispute arising from representations and agreements made by you in connection with Checkmate's acquisition of your company, VoiceBite Corporation, in May 2024.  In spite of our Firm's repeated urging that you retain counsel to represent you in the ongoing dispute, you have thus far declined to do so, choosing instead to represent yourself *pro se*.

As alleged in the draft complaint, you accuse our Firm of intentional and bad faith conduct in connection with four distinct matters, which you assert violate multiple provisions of the California Rules of Professional Conduct and the ABA Model Rules of Professional Conduct. We address each of those matters below.

**(1)    *Alleged Termination & Advancement of a False Resignation Claim*.**

You assert that on December 6, 2024, K&L Gates sent you a Notice of Claim on behalf of Checkmate falsely stating that you had resigned from your position with Checkmate.  That statement was not false.  Indeed, in the following paragraph of the draft complaint you indicate

K&L GATES LLP
K&L GATES CENTER  210 SIXTH AVENUE  PITTSBURGH  PA 15222-2613
T +1 412 355 6500  F +1 412 355 6501  klgates.com

that it was your view that you had resigned from the company ("I sent a 'good reason' resignation email") – and moreover the actual email you sent on November 14, 2024, confirms that fact:

> *I hereby resign from checkmate, with good reason, due to the demand made in late October that i accept a demotion, despite exceptional performance.*
>
> *As this demand was not lifted within 30 days, I resign as per our agreement.*

Thus, clearly there is nothing about Checkmate's position – as conveyed by our Firm as counsel on its behalf – regarding your resignation which is false, much less violates any ethics rules.

**(2)** ***Alleged Misuse of the "Joint Defenses" Summary of K&L Gates IP Letter.***

Next you assert that "[d]uring merger negotiations, just prior to close, Checkmate surprised us with new agreements including a 'Trade Secret Acknowledgement' letter drafted by K&L Gates", recite what you claim to be an excerpt of an email addressing the letter from Michael Bell, Checkmate's Chief of Strategy, and allege that "the letter was later weaponized against [you] personally".  First, Mr. Bell does not work for K&L Gates, as you acknowledge, and so we see no basis for how his alleged actions could give rise to an ethics complaint against our Firm. Second, the letter was intended to protect the parties against accusations of improper use of confidential information by memorializing enforceable agreements not to bring confidential information belonging to others onto company property, and there was nothing improper about it.  Third, in connection with the merger negotiations you were adverse to our Firm's client, were (as you admit) taking advice from VoiceBite's counsel, and of course were free to consult with any other counsel of your choosing.  There is nothing about the letter – or related communications between the parties themselves – which gives rise to a violation of any ethics rules by our Firm.

**(3)** ***Alleged Threat to Compel Disclosure of Privileged Communications***.

You also assert that it was improper of Mr. Keech, post-closing, to seek to obtain certain pre-closing communications you and others had with former counsel for VoiceBite, as you claim them to be privileged.  Any pre-closing communications you and others had with counsel for VoiceBite belonged to VoiceBite, which is now owned by our client Checkmate, as is any privilege that previously belonged to VoiceBite.  This is in accord with Section 2.2 of the Agreement and Plan of Merger, to which you are a party ("all of the . . . privileges . . . of each of the Company and Merger Sub will vest in the Surviving Corporation"), as well as governing Delaware law (*see, e.g.*, *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, C.A. No. 7906-CS (Del. Ch. Nov. 15, 2013) ("pre-merger attorney-client communications constitute assets of the target corporation that are transferred to the surviving corporation in a merger").  There is nothing improper about our client seeking access to communications which belong to it and/or to which it is legally entitled.

**(4)** *Alleged Misrepresentation of Agreement Excerpts.*

Lastly, you assert that certain agreements have been manipulated and misrepresented by our Firm and Mr. Keech and "do not match the versions [you were] provided just prior to signing by VoiceBite counsel." We have no way of knowing what you were provided or not provided by counsel for VoiceBite prior to closing, or whether or to what extent they match the agreements that form the basis for our client's claims against you. But to be clear, any suggestion by you that our Firm or Mr. Keech intentionally manipulated or misrepresented any documents is totally false and baseless.

* * * * * * * * * * * *

Having thoroughly reviewed the matters contained in your draft complaint, we are confident that our Firm and Mr. Keech, in representing a client adverse to you, have acted in a manner consistent with their professional obligations and that your alleged grievances directed at them are without merit. As we see nothing in your draft complaint which could give rise to any possible violation of the applicable ethics rules by our Firm or Mr. Keech, we consider this matter closed.

Very truly yours,

Charles M. Tea III

CMT/jms

3

# EXHIBIT H


## Letter to Shareholders Representative/ Draft Response
4 messages

**Grant Thomas** <gthomas@twtlaw.com>                          Thu, Feb 6, 2025 at 7:36 PM
To: Arjun Vasan <arjun.vasan@gmail.com>

Hello Arjun,

As promised attached is the Letter to the Shareholder's Representative and my draft response. If you have any questions or comments, please reach out. I was planning on sending this to K&L Gates tomorrow.

Best,
Grant



**Grant Thomas**
**Associate**
18101 Von Karman Avenue , Suite 230
Irvine, CA  92612

☎   949.679.6400

🖶   949.679.6405

✉   gthomas@twtlaw.com

   www.twtlaw.com

============================================================

CONFIDENTIALITY NOTICE:

This electronic mail message and any attached files contain information intended for the exclusive

use of the individual or entity to whom it is addressed and may contain information that is

proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you

are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction.  Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.

========================================================

---

**2 attachments**

 **2025-01-29 Ltr. to Holder Representative re Direct Claim (1).pdf**
287K

 **2025.02.07 VoiceBite Shareholders' Response to January 29, 2025 Letter in re Indemnification.docx**
75K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Thu, Feb 6, 2025 at 10:05 PM
To: Grant Thomas <gthomas@twtlaw.com>

Hi Grant,

Looks good. Shouldn't we also demand payment of the withheld bonuses?

- Arj
[Quoted text hidden]

---

**Grant Thomas** <gthomas@twtlaw.com>                                      Thu, Feb 6, 2025 at 10:06 PM
To: Arjun Vasan <arjun.vasan@gmail.com>

Hi Ari,

We will it's just going to be in a separate letter. We'll send this first.

Best,
Grant

Get Outlook for iOS

---

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Thursday, February 6, 2025 10:05:06 PM
**To:** Grant Thomas <gthomas@twtlaw.com>
**Subject:** Re: Letter to Shareholders Representative/ Draft Response

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Thu, Feb 6, 2025 at 10:33 PM
To: Grant Thomas <gthomas@twtlaw.com>

Sounds good, thanks!
[Quoted text hidden]

# EXHIBIT I

CHECKMATE.COM INC.

NON-COMPETITION AGREEMENT

This NON-COMPETITION AGREEMENT (this "***Agreement***"), dated April 30, 2024 is made by and between Arjun Vasan (the "***Stockholder***") and Checkmate.com Inc., a Delaware corporation ("***Acquirer***"). For purposes of this Agreement, "Company" shall be deemed to include Company and its direct and indirect subsidiaries.

BACKGROUND

A.          Acquirer and VoiceBite Corporation, a Delaware corporation (the "***Company***") are parties to an Agreement and Plan of Merger dated as of the date hereof (the "***Merger Agreement***"), pursuant to which Acquirer will acquire the Company (the "***Merger***"). Capitalized terms used, but not defined herein, shall have the meanings assigned to such terms in the Merger Agreement. Capitalized terms used, but not defined herein, shall have the meanings assigned to such terms in the Merger Agreement.

B.          Stockholder beneficially holds a substantial amount of the Company's capital stock, and will receive substantial consideration as a result of Stockholder's stock ownership in the Company upon the closing of the Merger (the "***Closing***").

C.          Stockholder understands and agrees that as a Company Employee and a key member of the Company's management and technical workforce, Stockholder will obtain, extensive and valuable knowledge, technical expertise, confidential information and other trade secrets concerning the Business.

D.          Stockholder will be hired as an at-will employee of Company, and Stockholder will derive significant value from Company's agreement to provide Stockholder with confidential and proprietary information relating to the business and operation of the Company in the course of Stockholder's duties to Company.

E.          This Agreement is necessary to protect Company's legitimate interests, including its legitimate interests in its confidential information and trade secrets. Stockholder understands and acknowledges that the execution and delivery of this Agreement by Stockholder is a material inducement to the willingness of Company to offer Stockholder employment by Company and is a condition of such employment, for the purpose of protecting Company's legitimate interests in its confidential information and trade secrets.

**NOW, THEREFORE,** in consideration of the foregoing premises and for good and valuable consideration, receipt of which is hereby acknowledged, Stockholder, intending to be legally bound, agrees as follows:

1.          **Certain Defined Terms**. As used herein:

"***Business***" means the Company's current business of providing artificial intelligence powered voice systems for phone answering or for restaurant drive through order processing.

"***Good Reason***" means: (i) a material reduction in Stockholder's job responsibilities, job title or duties, taken in the aggregate, provided that Good Reason to terminate employment shall not exist after any acquisition of the Company (by merger or otherwise) because Stockholder will be employed by a subsidiary of the parent company or because of reasonable changes in responsibilities, job title or duties resulting from

any such acquisition; (ii) without Stockholder's prior written consent, the Company requires Stockholder to relocate to a facility or location more than thirty (30) miles away from the location at which Stockholder was working immediately prior to the required relocation; or (iii) a reduction of more than ten percent (10%) in Stockholder's then-current base salary (other than as part of an across-the-board, proportional salary reduction applicable to all executive officers), provided that no change in job title after the first anniversary of the Closing shall constitute Good Reason, and provided further that none of the foregoing events or conditions will constitute Good Reason unless Stockholder provides the Company with written objection to the event or condition within 30 days following the initial occurrence thereof, the Company does not reverse or otherwise cure the event or condition within 30 days of receiving that written objection, and Stockholder resigns his employment within 30 days following the expiration of that cure period.

"*Restrictive Period*" means the period commencing on the date hereof and ending on the date that is two years from the date hereof, provided that the Restrictive Period shall terminate if Stockholder terminates his employment for Good Reason or the Company terminates Stockholder's employment other than for Cause; provided that in the event that it is judicially determined that Stockholder has breached any provision of this Agreement, the Restrictive Period shall be automatically extended by a number of days equal to the total number of days in the period from the date on which such breach shall have first occurred through the date as of which such breach shall have been fully cured.

"*Cause*" means (i) Stockholder's failure or refusal to perform his duties to the Company in any material way after specific instruction from the Company which failure or refusal, if curable (in the reasonable determination of the Company), is not cured to the reasonable satisfaction of the Company within thirty (30) days after delivery of written notice thereof; (ii) Stockholder's failure to cooperate in any internal or external investigation involving the Company; (iii) Stockholder's indictment for, conviction of, or plea of guilty or nolo contendere to, any felony (whether or not any right to appeal has been or may be exercised) or any crime of moral turpitude; (iv) Stockholder's commission of fraud, embezzlement, dishonesty, misappropriation or reckless or willful destruction of the Company's property; (v) any act or omission constituting willful malfeasance, gross negligence or willful or gross misconduct relating to the business of the Company, in either case resulting in harm to the Company; (vi) Stockholder's breach of any statutory or common law duty of loyalty to the Company; or (vii) Stockholder's breach of this Agreement, the Merger Agreement, the Transaction Documents, Offer Letter, Confidential Information and Inventions Agreement, or other signed agreement with or for the benefit of the Company.

"*Restrictive Territory*" means the United States, the European Union and Canada and each other jurisdiction in which the Company has any customers, employees or operations during the Restrictive Period.

2.    **Agreement Not to Compete**. During the Restrictive Period and except as otherwise provided herein or unless approved by Company in writing, Stockholder agrees that Stockholder will not, as an employee, agent, consultant, advisor, independent contractor, general partner, officer, director, Stockholder, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity, directly or indirectly, for himself or on behalf of any other Person (other than Company or any of its affiliates):

(a)    engage or participate in, or acquire any financial or beneficial interest in, any business that competes with the Business in the Restrictive Territory; or

(b)    induce or assist any other Person to engage in any of the activities described in subparagraph (a).

Notwithstanding the foregoing, Stockholder may own, directly or indirectly, solely as an investment, up

2

to 1% of any class of "publicly traded securities" of any business that is competitive or substantially similar to the Business. The term "publicly traded securities" shall mean securities that are traded on a national securities exchange or on the over-the-counter market.

3.    **Agreement Not to Solicit**. Stockholder further agrees that during the Restrictive Period, Stockholder will not, as an employee, agent, consultant, advisor, independent contractor, general partner, officer, director, Stockholder, investor, lender or guarantor of any corporation, partnership or other entity, or in any other capacity, directly or indirectly, for himself or on behalf of any other Person (other than Company or any of its affiliates):

(a)    solicit or attempt to solicit any of employees of Acquirer or the Company or induce any of employees of Acquirer or the Company to resign from their employment by Acquirer or the Company, as applicable; or

(b)    induce or assist any other Person to engage in any of the activities described in subparagraph (a).

4.    **Agreement Not to Disparage**. During the term of this Agreement and during the Restrictive Period, Stockholder agrees that Stockholder will not directly or indirectly or induce others to disparage Company or the Company in any manner that is harmful to the business, business reputation or reputation of Company or the Company. The executive  team of Company will not make any statement of a disparaging nature about Stockholder. Nothing in this paragraph shall prohibit a party from providing truthful information in response to a subpoena or other legal process, or otherwise required by law.

5.    **Acknowledgment**. Stockholder hereby acknowledges and agrees that:

(a)    this Agreement is necessary for the protection of the legitimate business interests of Company in acquiring the Company, including but not limited to trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers, patients, or clients, and/or customer or client goodwill associated with an ongoing business;

(b)    the covenants set forth herein are separately bargained-for consideration, and the execution and delivery and continuation in force of this Agreement is a material inducement to Company to enter into employment with Stockholder, without which Company would not offer or enter into such employment;

(c)    the scope of this Agreement is reasonable in duration, geographic scope and in the types of restricted activities;

(d)    Stockholder's expertise and capabilities are such that his obligations under this Agreement (and the enforcement thereof by injunction or otherwise) will not prevent him from earning a livelihood;

(e)    Stockholder represents and warrants that neither the execution and delivery nor the performance of this Agreement will result directly or indirectly in a violation or breach of any agreement or obligation by which Stockholder is or may be bound, the violation of which would impair Stockholder's ability to perform Stockholder's obligations under this Agreement; and

(f)    Stockholder has read and understands California Business and Professions Code Section 16601 regarding the enforceability of covenants not to compete. Stockholder acknowledges and

3

agrees that the covenants contained in this Agreement are a valid restraint on trade pursuant to Section 16601 and are binding and enforceable against Stockholder in accordance with their terms.

6.      **Remedy**. Stockholder acknowledges and agrees that (a) the rights of Company under this Agreement are of a specialized and unique character and that immediate and irreparable damage will result to Company if Stockholder fails to or refuses to perform his obligations under this Agreement and (b) Company shall be entitled, in addition to any other remedies and damages available, to obtain an injunction in a court of competent jurisdiction to restrain any such failure or refusal without posting bond or other security, and without the necessity of proving actual damages. No single exercise of the foregoing remedies shall be deemed to exhaust Company's right to such remedies, but the right to such remedies shall continue undiminished and may be exercised from time to time as often as Company may elect.

7.      **Severability**. If any provisions of this Agreement as applied to any part or to any circumstances shall be adjudged by a court to be invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. Company and Stockholder intend this Agreement to be enforced as written. If any provision, or part thereof, however, is held to be unenforceable because of the duration thereof or the area covered thereby, all parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases and in its reduced form such provision shall then be enforceable.

8.      **Amendment**. This Agreement may not be amended except by an instrument in writing signed by Company's duly authorized representative, or his designee, and Stockholder.

9.      **Waiver**. No waiver of any nature, in any one or more instances, shall be deemed to be or construed as a further or continued waiver of any breach of any other term or agreement contained in this Agreement.

10.     **Headings**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.     **Governing Law**.

        (a)    This Agreement shall be construed and interpreted and its performance shall be governed by the laws of the state of Delaware without regard to conflicts of law principles of any jurisdiction.

        (b)    The parties hereto agree that any proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in any federal court located in New York County in the State of New York or any New York state court located in New York County, and each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding in any such court or that any such proceeding brought in any such court has been brought in an inconvenient forum. Process in any such proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

12.     **Dispute Resolution**.  Any controversy, dispute or claim regarding whether a termination is for Cause shall first be settled through good faith negotiation. If the dispute cannot be settled through negotiation, the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS.  At the conclusion of the mediation, the mediator shall, if requested by either party, provide a non-binding reasoned opinion on the issue of whether a termination was for "Cause" as defined in this

4

Agreement (the "Mediator Opinion").  The Mediator Opinion shall be confidential and may not be used in any subsequent litigation, arbitration or other proceeding.  The mediation shall not involve mandatory discovery and neither the mediator nor any party shall have the ability to require or compel disclosure of any information or materials. All offers, promises, conduct and statements, whether oral or written, made in the course of the negotiation or mediation by any of the parties, their agents, employees, experts and attorneys are confidential, privileged and inadmissible for any purpose, including impeachment, in arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the negotiation.

13.    **Entire Agreement**. This Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and undertakings, both written and oral, between the parties, with respect to the subject matter of this Agreement (but does not in any way merge or supersede the Stockholder's Offer Letter and or Confidential Information and Inventions Agreement with Company).

*[SIGNATURE PAGES FOLLOW.]*

5

**IN WITNESS WHEREOF**, Company and Stockholder have executed this Non-Competition Agreement on the day and year first above written.

**STOCKHOLDER:**

Arjun Vasan

**Arjun Vasan**

6

 

 

**IN WITNESS WHEREOF**, Company and Stockholder have executed this Agreement on the day and year first above written.

**CHECKMATE.COM INC**.
a Delaware corporation

By: _____

Name: Vishal Agarwal
Title:  Chief Executive Officer

# EXHIBIT L



---

## Fwd: Lunchbox - Voice AI
1 message

**Vishal Agarwal** <vishal@itsacheckmate.com>                                   Thu, Nov 14, 2024 at 8:24 AM
To: Mike Bell <michaelb@itsacheckmate.com>, Amy Brown <amy.brown@itsacheckmate.com>

FYI



**Vishal Agarwal**
FOUNDER AND CEO
+1 855.953.4340 | itsacheckmate.com

---------- Forwarded message ---------
From: **Nabeel Alamgir** <nabeel@lunchbox.io>
Date: Thu, Nov 14, 2024 at 9:43 AM
Subject: Re: Lunchbox - Voice AI
To: <vishal@itsacheckmate.com>

Here you go.



**Nabeel Alamgir**
CEO & Co-founder
C: 646.867.5395
O: 1216 Broadway, NY 10001
Website / LinkedIn / Instagram

Sent via Superhuman iOS

On Fri, Nov 8 2024 at 10:40 AM, Arjun Vasan <arjun.vasan@gmail.com> wrote:

Ok, I figured it's safer to send some older recordings that there is no potential risk.

These are from Cyborg (my earlier company) and from 2021-2022, so the voices themselves are not as nice as we can do now. Though it's pre chatGPT, we were amongst the earliest users of LLMs (GPT-3) for this use case while everyone else was still focused on NLP. We worked with OpenAI directly to train the marco's pizza cart prediction model so we could post fully automatically via API.

Since we didn't have API access for HoF and Lee's sandwiches, those orders were partly automated using RPA on their websites, but used humans to verify.

We sold Cyborg to Presto, but did not transfer IP in the transaction, since we switched over to drive thru there and launched del taco, weinerschnitzel and carls jr.

1. House of Fortune (Chinese Vegan)

 hof-a-good-name.wav

-76-

hof-howdy-john.mp3

2. Lee's sandwiches (Vietnamese banh me) * (attached below)
lees-that-is-impressive.wav

3. Marco's Pizza (4th or 5th largest pizza chain) * (attached below)

Listen thru to the end, and enjoy!

- Arj


Sent from Gmail Mobile


On Thu, Nov 7, 2024 at 7:33 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
Hey,

Think we connected a while back about voice ordering, then ended up being acquired by Presto, left started another voice ai company, acquired by checkmate.

Let's connect, I'm thinking of leaving here .. the culture doesn't appeal to me .. I've heard good things about lunchbox over the years.

I know you've started in voice - i noticed you were doing some of zalat pizza's phone ordering with a call center. We're also in zalat, with full voice ai.

(We being checkmate, where i'm not happy atm).

1(562)900-6541

I have a short window to decide to leave and nullify my non compete .. like just 2 weeks. And i can bring over 2 additional 10x engineers i recruited here.

- Arj

Sent from Gmail Mobile

Register Now: Virtual Showcase of Lunchbox Catering & CRM - get an inside look at the back-end features that drive $500+ check averages and an exclusive interview with Paris Baguette.



# EXHIBIT M

Merger Agreement Excerpts (§ 7.4 – Release and Employment Carve Out)

        Section 7.4        <u>Release.</u>

        (a)        <u>Release</u>. Each Stockholder, on behalf of such Stockholder and each of such Stockholder's Affiliates, successors and assigns (individually, a "<u>Stockholder Releasor</u>" and collectively, "<u>Stockholder Releasors</u>"), effective as of the Closing, hereby releases and forever discharges, Purchaser, the Group Company, and each of their respective individual, joint or mutual, past and present Affiliates, successors and assigns (individually, a "<u>Purchaser Releasee</u>" and collectively, "<u>Purchaser Releasees</u>") from any and all obligations, Contracts, debts, liabilities and obligations that any Purchaser Releasee now has or has ever had in favor of any Stockholder Releasor, in each case, of any nature (whether absolute or contingent, asserted or unasserted, known or unknown, primary or secondary, direct or indirect, and whether or not accrued) arising contemporaneously with or before the Closing or on account of or arising out of any matter, cause or event occurring contemporaneously with or before the Closing, whether pursuant to their respective certificate of incorporation or by-laws (or comparable documents), any Contract or otherwise and whether or not relating to claims pending on, or asserted after, the Closing Date (collectively, the "<u>Released Claims</u>"), in each case, other than (i) any right of such Stockholder arising under this Agreement or any Transaction Document including claims arising hereunder or thereunder; (ii) to the extent Stockholder Releasor is an employee of any Group Company, any right of Stockholder Releasor to receive accrued but unpaid wages, salary, compensation, bonuses, accrued vacation and any other accrued but unpaid compensation and/or benefits (other than any equity-based compensation) owed to Stockholder Releasor in its capacity as a service provider to the Company, provided that any such amount has been included as a consolidated liability of the Company as set out in the definition of Net Working Capital, (iii) any right to indemnification, advancement of expenses, exculpation, or rights to benefit from applicable director and officer indemnification agreements, the Charter and Bylaws, or (iv) any claim that, as a matter of Applicable Law, cannot be released by private agreement.

## Exhibit M – Merger Agreement Excerpts

Merger Agreement Excerpts (§ 8.5 – Liability Cap)

Section 8.5    Limitations.

(a)    Notwithstanding anything in this Section 8 to the contrary, no Purchaser Indemnified Party will be entitled to indemnification for any Purchaser Losses until the aggregate of all such indemnifiable Purchaser Losses exceeds in total $25,000, in which case the Purchaser Indemnified Parties will be entitled to indemnification pursuant to Section 8.1(a) for all Purchaser Losses, including the initial $25,000

provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 4.1 (Organization and Capacity), Section 4.2 (Authority and Enforceability), Section 4.3 (Title to Shares), Section 4.4 (No Conflict), Section 5.1 (Organization; Standing and Power; Subsidiaries), Section 5.2 (Authority; Enforceability; Company Action), Section 5.4 (Capitalization), Section 5.9 (Intellectual Property), Section 5.13 (Tax Matters) or Section 5.18 (Brokers, Finders and Investment Bankers) (collectively, the "Holder Fundamental Representations"). No Indemnifying Pre-Closing Holder shall be liable pursuant to Section 8.1(a) for amounts in excess of the Merger Consideration received by such Indemnifying Pre-Closing Holder (based on the Purchaser Share Value) plus the Final Payment Amounts under such Indemnifying Pre-Closing Holder's Bonus Agreement except in the event of Fraud by the Company or such Indemnifying Pre-Closing Holder.

(b)    Notwithstanding anything in this Section 8 to the contrary, no Holder Indemnified Party will be entitled to indemnification for any Holder Losses until the aggregate of all such indemnifiable Holder Losses exceeds in total $25,000, in which case the Holder Indemnified Parties will be entitled to indemnification pursuant to Section 8.2 for all Holder Losses, including the initial $25,000 provided, however, that the limitations set forth in this Section 8.5 will not apply to any claim arising out of or related to Fraud or a breach of any of the representations and warranties contained in Section 6.1 (Organization; Standing and Power), Section 6.2 (Authority; Enforceability; Company Action), and Section 6.4 (Finders' Fees) (collectively, the "Purchaser Fundamental Representations" and together with the Holder Fundamental Representations, the "Fundamental Representations"). Purchaser and Merger Sub collectively shall not be liable for amounts in aggregate in excess of the Merger Consideration (based on the Purchaser Share Value) plus the Final Payment Amounts under the Bonus Agreements except in the event of Fraud by Purchaser or Merger Sub.

## Exhibit M – Merger Agreement Excerpts

### Merger Agreement Excerpts (§ 8.8 – Exclusive Remedy)

~~parties contained in such representation or warranty.~~

Section 8.8    Exclusive Remedy.  The parties agree that, excluding actions grounded in Fraud, from and after the Closing Date, the indemnities provided in this Section 8 will constitute the sole and exclusive remedy of any Indemnified Party for damages arising out of, resulting from or incurred in connection with any claims related to this Agreement or arising out of the transactions contemplated hereby; provided, however, that this exclusive remedy for damages does not preclude a party from bringing an action for specific performance or other equitable remedy to require a party to perform its obligations under this Agreement or any agreement entered into in connection herewith.

### Merger Agreement Excerpts (§ 9.1 – Holder Representative

MISCELLANEOUS PROVISIONS

Section 9.1    Holder Representative.

(a)    The parties agree that it is desirable to designate a representative to act on behalf of the Pre-Closing Holders with respect to all matters arising under this Agreement.  The Pre-Closing Holders have designated Robert Nessler as the initial Holder Representative, and adoption of this Agreement by the Company Stockholder Approval will constitute ratification and approval of such designation.  The Holder Representative may resign at any time, and may be removed by the vote of Persons which collectively owned more than 50% of the Participating Shares immediately prior to the Effective Time; provided, however, that any such removal will not be effective unless and until a successor Holder Representative reasonably acceptable to Purchaser has been appointed and accepts such position and the terms hereof.

(b)    The Holder Representative will have such powers and authority as are necessary to carry out the functions assigned to it under this Agreement; provided, however, that the Holder Representative will have no obligation to act on behalf of the Pre-Closing Holders, except as expressly provided herein, and for purposes of clarity, there are no obligations of the Holder Representative in any ancillary agreement, schedule, exhibit or the Company Disclosure Schedule.  Without limiting the generality of the foregoing, the Holder Representative will have full power, authority and discretion to (i) act according to the terms of this Agreement in the absolute discretion of the Holder Representative, (ii) represent the Pre-Closing Holders and their respective successors and assigns with respect to all matters arising under this Agreement, including, after the Closing, to negotiate and enter into amendments to this Agreement for and on behalf of the Pre-Closing Holders and make all decisions required or allowed to be made by the Holder Representative pursuant to the provisions hereof and thereof (including the right to defend, settle, compromise or take any other action with respect to any matter for which Indemnified Parties seek indemnification under Section 8) and (iii) in general to do all things and to perform all acts, including executing and delivering any agreements, certificates, receipts, instructions, notices or instruments contemplated by or deemed advisable in connection with this Agreement.  Each Pre-Closing Holder, by virtue of the adoption of this Agreement by the Company Stockholder Approval, (x) agrees that all actions taken by the Holder Representative under this Agreement will be binding upon such Pre-Closing Holder and such Pre-Closing Holder's successors and assigns as if expressly confirmed and ratified in writing by

## Exhibit M – Merger Agreement Excerpts

Merger Agreement Excerpts (§ 9.7-8 – Forum Selection and Jury Waiver)

Section 9.7    Governing Law; Jurisdiction and Venue.

(a)    This Agreement will be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

(b)    Any legal action or other Legal Proceeding relating to this Agreement or the enforcement of any provision of this Agreement will be brought or otherwise commenced exclusively in any state or federal court located in the County of New York, State of New York.  Each party to this Agreement:

(i)    expressly and irrevocably consents and submits to the jurisdiction of each state and federal court located in the County of New York, State of New York (and each appellate court located in the State of New York), in connection with any Legal Proceeding;

(ii)    agrees that service of any process, summons, notice or document by U.S. mail addressed to her, him or it at the address set forth in Section 9.11 will constitute effective service of such process, summons, notice or document for purposes of any such Legal Proceeding;

Section 9.8    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BETWEEN THE PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

Merger Agreement Excerpts (§ 9.11)

Section 9.11    Notices.  All notices, consents, waivers and other communications required or permitted by this Agreement will be in writing and will be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); or (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by notice to the other parties); provided that with respect to notices deliverable to the Holder Representative, such notices shall be delivered solely via email or facsimile:

# EXHIBIT Q



Arjun Vasan <arjun.vasan@gmail.com>

## Notice of Breach Regarding Service Method – Merger Agreement § 9.11
11 messages

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                              Wed, May 28, 2025 at 11:54 AM
To: "Warns, Tom A." <tom.warns@klgates.com>, "Keech, Ryan Q." <ryan.keech@klgates.com>

Mr. Warns, Mr. Keech,

I have noticed that you are now sending legal notices to my correct Cerritos, CALIFORNIA address, but via first-class mail.

As you are aware, this is not compliant with Merger Agreement § 9.11, which expressly requires notice by overnight courier.

Please ensure that all future legal notices are sent by FedEx, UPS, or similar such overnight service.

Kindly confirm in writing that you will comply with the notice requirements going forward.

Sincerely,

Arjun Vasan

---

**Warns, Tom A.** <Tom.Warns@klgates.com>                                              Wed, May 28, 2025 at 5:38 PM
To: Arjun Vasan <arjun.vasan@gmail.com>, "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Mr. Vasan,


As a pro se defendant who has not consented to electronic service, we are required to serve you consistent with Rule 2.C in Judge Furman's Individual Rules in Civil Pro Se cases. We will continue to do so going forward. Section 9.11 of the Merger Agreement is inapplicable with respect to filings in this action.


Best,

Tom


---

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Wednesday, May 28, 2025 2:55 PM
**To:** Warns, Tom A. <Tom.Warns@klgates.com>; Keech, Ryan Q. <Ryan.Keech@klgates.com>
**Subject:** Notice of Breach Regarding Service Method – Merger Agreement § 9.11

---

[Quoted text hidden]

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Tom.Warns@klgates.com. ...

**Arjun Vasan** <arjun.vasan@gmail.com>                                     Wed, May 28, 2025 at 6:01 PM
To: "Warns, Tom A." <Tom.Warns@klgates.com>
Cc: "Keech, Ryan Q." <Ryan.Keech@klgates.com>

Mr. Warns, Mr. Keech,

Thank you for your response. However, I must reiterate that Section 9.11 of the Merger Agreement expressly requires that all legal notices and communications be delivered by overnight courier (e.g., FedEx, UPS, or equivalent), unless otherwise agreed in writing. I do not agree.

Judge Furman's Individual Practices require only that pro se parties be served with a paper copy of any electronically filed document, but do not specify or restrict the method of such service. As there is no direct conflict between the court's requirements and the contractual notice provision, the parties' bargained-for service method must control.

> C. Service on a Pro Se Party. Absent a pro se party consenting to receipt of
> electronic service, counsel in pro se cases **must serve a pro se party with a paper
> copy** of any document that is filed electronically and must file with the Court a
> separate Affidavit of Service. Submissions filed without proof of service that the
> pro se party was served will not be considered.

Accordingly, I do not consent to any service method other than that prescribed by Section 9.11 of the Merger Agreement. Please ensure that all future legal notices, filings, and communications are delivered via overnight courier as required.

If you continue to serve by first-class mail or any other non-compliant method, I will object on the grounds of improper service and reserve all rights available to me under the agreement and applicable law.

Thank you for your attention to this matter.

Sincerely,

Arjun Vasan

[Quoted text hidden]

---

**Keech, Ryan Q.** <Ryan.Keech@klgates.com>                                Wed, May 28, 2025 at 6:12 PM
To: Arjun Vasan <arjun.vasan@gmail.com>, "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Vasan,


Thank you for your response.  Given that you have now reviewed the Merger Agreement and acknowledge that its provisions apply to the litigation of this dispute (which is an acknowledgment that we appreciate), we trust that you will be withdrawing your opposition to Checkmate's pending motion to dismiss and answering the complaint filed and pending against you in New York.  We would be happy to prepare drafts of any required notices if you would prefer that we do so.  Please let us know.


Best regards,




**Ryan Q. Keech**
Partner
K&L Gates LLP
10100 Santa Monica Blvd., 8th Floor
Los Angeles, California 90067
Phone: 310.552.5070

Mobile: 646.510.3630
ryan.keech@klgates.com

www.klgates.com

*Austin  Beijing  Berlin  Boston  Brisbane  Brussels  Charleston  Charlotte  Chicago  Dallas  Delaware Doha  Dubai  Dublin  Fort Worth  Frankfurt  Harrisburg  Hong Kong  Houston  Kansas City  London Los Angeles  Luxembourg  Melbourne  Miami  Milan  Munich  Nashville  Newark  New York  Orange County  Palo Alto  Paris  Perth  Pittsburgh  Portland  Raleigh  Research Triangle Park  San Francisco São Paulo  Seattle  Seoul  Shanghai  Singapore  Sydney  Taipei  Tokyo  Washington, D.C.*

---

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Wednesday, May 28, 2025 6:01 PM
**To:** Warns, Tom A. <Tom.Warns@klgates.com>
**Cc:** Keech, Ryan Q. <Ryan.Keech@klgates.com>
**Subject:** Re: Notice of Breach Regarding Service Method – Merger Agreement § 9.11

[Quoted text hidden]

---

Arjun Vasan <arjun.vasan@gmail.com>                        Wed, May 28, 2025 at 6:45 PM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>
Cc: "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Keech,

It applies to Checkmate's claims in New York, not to my claims in California. I will be proceeding with my motion to dismiss in the former, and with my *individual* claims in the latter (to which I have never said it applies, and it clearly does not in plain text)

- Arjun

Sent from Gmail Mobile
[Quoted text hidden]

---

Arjun Vasan <arjun.vasan@gmail.com>                        Wed, May 28, 2025 at 7:38 PM
To: "Keech, Ryan Q." <ryan.keech@klgates.com>, "Warns, Tom A." <tom.warns@klgates.com>

And, Mr. Keech, if your client was genuinely attempting to enforce the Merger Agreement (and any other agreement it alleges I am subject to) in good faith, it would have provided executed copies upon my numerous requests dating back to November, 2024.

That it did not—and indeed has not—draws a clear inference of bad faith and selective enforcement. Rather, it has expected me to pursue my claims blindly, and more egregiously demanded I answer its claims the same way.

This is not surprising. Your client has established a clear disregard for its contracts and the law.

I am confident the courts in both jurisdictions will reach the same conclusion.

Sent from Gmail Mobile
[Quoted text hidden]

---

Keech, Ryan Q. <Ryan.Keech@klgates.com>                        Wed, May 28, 2025 at 8:29 PM
To: Arjun Vasan <arjun.vasan@gmail.com>, "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Vasan,

Notwithstanding these outbursts and puzzling attempts to harass Checkmate and its counsel, it is clear, as it is with many things you send, that you understood what you meant by Merger Agreement when you used those terms.  Your written demands to enforce what you correctly admit are the "bargained for" provisions of the Merger Agreement to bind yourself and the parties to this litigation require a prompt withdrawal of your opposition to Checkmate's motion to dismiss and your answering of the complaint pending against you so as to fully and promptly enable the parties to address the evidence of the misconduct surrounding the VoiceBite transaction and your participation in it.

We look forward to your compliance with the foregoing.

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                      Wed, May 28, 2025 at 9:06 PM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>
Cc: "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Keech,

I wish you luck in making that argument in front of an actual federal judge. Unlike Checkmate, I never sought to enforce the merger agreement in my claims. The merger agreement contemplates a collective process, not amenable to individual claims, such as mine. Checkmate is violating that collective process in New York.

Or, perhaps you are aware of a statute similar to Labor Code 925 that protects corporations from their employees? Enlighten me.

- Arjun

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                      Thu, May 29, 2025 at 5:10 PM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>, "Warns, Tom A." <tom.warns@klgates.com>

Mr. Keech,

It is further noted that, while you accuse me of an outburst, you appear to be having a tantrum of your own. Your lack of linguistic precision is also duly noted.

As I have previously noted, you might consider running your next draft through generative AI. There is nothing to be ashamed of—just a suggestion to improve your professional capabilities.

In any case, your recent and unhinged demands have been duly noted and will be presented to the appropriate judicial authorities in due course.

Best regards,

Arjun Vasan

[Quoted text hidden]

---

**Keech, Ryan Q.** <Ryan.Keech@klgates.com>                                  Thu, May 29, 2025 at 5:27 PM
To: Arjun Vasan <arjun.vasan@gmail.com>, "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Vasan (or the "generative AI" program posing as Mr. Vasan),

We take it from this afternoon's outburst that you consider it to be "unhinged" for our client to reject your apparent expectation that our client will pay you millions of dollars notwithstanding the evidence of your participation in and orchestration of the fraudulent conduct alleged in the complaint pending against you. Obviously, our client disagrees with your position.  Further, and while we continue to be puzzled by what you think you are doing, we note your latest admission regarding your obvious and improper use of "generative AI" to facilitate your threats and harassment of Checkmate and its counsel and will continue to proceed accordingly.

Best regards,



**Ryan Q. Keech**
Partner
K&L Gates LLP
10100 Santa Monica Blvd., 8th Floor
Los Angeles, California 90067
Phone: 310.552.5070
Mobile: 646.510.3630
ryan.keech@klgates.com

www.klgates.com

*Austin   Beijing   Berlin   Boston   Brisbane   Brussels   Charleston   Charlotte   Chicago   Dallas   Delaware Doha   Dubai   Dublin   Fort Worth   Frankfurt   Harrisburg   Hong Kong   Houston   Kansas City   London Los Angeles   Luxembourg   Melbourne   Miami   Milan   Munich   Nashville   Newark   New York   Orange County   Palo Alto   Paris   Perth   Pittsburgh   Portland   Raleigh   Research Triangle Park   San Francisco São Paulo   Seattle   Seoul   Shanghai   Singapore   Sydney   Taipei   Tokyo   Washington, D.C.*

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Thursday, May 29, 2025 5:11 PM
**To:** Keech, Ryan Q. <Ryan.Keech@klgates.com>; Warns, Tom A. <Tom.Warns@klgates.com>
**Subject:** Re: Notice of Breach Regarding Service Method – Merger Agreement § 9.11

[Quoted text hidden]

---

Arjun Vasan <arjun.vasan@gmail.com>                                    Thu, May 29, 2025 at 7:30 PM
To: "Keech, Ryan Q." <Ryan.Keech@klgates.com>
Cc: "Warns, Tom A." <Tom.Warns@klgates.com>

Mr. Keech,

What is unhinged is contradicting your own parties' stated position in 34 minutes.

5:38pm: Section 9.11 of the Merger Agreement is inapplicable with respect to filings in this action.
6:12pm: .. acknowledge that its provisions apply to the litigation of this dispute (which is an acknowledgment that we appreciate)

- Arjun

# EXHIBIT S

 **Mike Bell**
April 22, 2024, 5:27 AM
IP Acknowledgement Letter
To: arj@voicebite.ai, Robert Nessler, chris@voicebite.ai, Alan Foster, Todd Murtha, Vishal Agarwal

Good Morning,

Later in this process, as it was becoming clear that the transaction would contain less indemnification protection than we had envisioned or expected, we engaged an IP litigation firm to help us understand the risks and communicate them to the Checkmate board accurately. The firm, KL Gates, advised us that a stand alone letter could provide additional protection in the event we find ourselves in litigation with a prior employer. They explained the letter like this:

"The Holders and the Company have a joint interest in insulating themselves against the prospect of liability in any potential lawsuit arising from the potential misappropriation of trade secrets or other intellectual property. Common in deals involving specialized IP, the letter supplements the existing representations and warranties. Its effect is to provide evidence that everybody understands and takes seriously their obligations regarding the protection of proprietary information and trade secrets. It provides a means by which the Holders and the Company will be able to jointly argue, in the event any such suit is brought, that the plaintiffs cannot make a showing of improper acquisition – thus requiring dismissal."

We would like to get on call with all parties to have a constructive, cooperative conversation about how to make the draft of the letter acceptable to you all. We are aligned in that this letter should not increase your exposure in any way and should come with whatever protections you need. So instead of categorically rejecting the letter, we would ask that you approach this request from the same side of the table, as one team, looking to solve a problem.

Alan, I would ask that you communicate your proposed edits to Todd in writing, so that we have open communication and facts to work with.

Robert, can you please send me some times that work on your end?

Thanks in advance for your help solving this item.

Mike

# EXHIBIT U

Sat, Apr 6 at 11:22 AM

Robert Nessler



11:21

MB

Mike ›

I think they work with 2 or 3 DMB vendors/partners I'll back through some threads with them and see

Today 11:14 AM

For some reason my slack isn't working but Alan emailed us this AM that he'd get the final reps/warranties to us to today to give to you before he goes out of town.

Haven't gotten them yet

If he doesn't you should seriously fire him. This is ridiculous.

Text Message

RN

Christopher Lam

Well at least he's not mad about how we said there's amendments to reps/warranties

CL

# EXHIBIT Y



December 6, 2024

Ryan Q. Keech
Partner
Ryan.Keech@klgates.com

T +1 310 552 5070
F +1 310 552 5001

**VIA ELECTRONIC MAIL ONLY**

Pietari Grohn, Esq.
GC+ Law Group
101 The Embarcadero, Suite 211
San Francisco, California 94110
pietari@gcpluslaw.com

Re:     **VoiceBite/Arjun Vasan – Notice of Direct Claim**

Dear Mr. Grohn:

We understand that you represent Arjun Vasan.  Pursuant to Section 8.3(c) of the Agreement and Plan of Merger ("Merger Agreement") entered into by and between our client Checkmate.com Inc. ("Checkmate") in connection with Checkmate's April 2024 acquisition of VoiceBite Corporation ("VoiceBite"), we write to (a) inform you that we have been retained to investigate claims and defenses against your client arising out of his conduct in connection with such transaction and his recently-ended service as a Checkmate employee; and (b) provide you with notice of our client's Direct Claim for indemnification for certain Company losses against your client, Arjun Vasan.[1]  We ask that you please direct all correspondence regarding this matter to our attention.

By way of background: as you know, Mr. Vasan became an employee of Checkmate as a result of a series of transactions that closed on or about April 30, 2024, whereby Checkmate acquired a controlling interest in VoiceBite.  As you also know, VoiceBite was co-founded by Mr. Vasan and held itself out to Checkmate, the market and the public as holding the rights in certain software enabling the provision of highly valuable AI-based phone ordering solutions.  Much of the reason for Checkmate's agreement to acquire a controlling interest in VoiceBite AI was premised on VoiceBite's presumed ownership of its own intellectual property and your client's related express representations and warranties concerning same, which representations and warranties were backed up by several express indemnification provisions.

As part of the Checkmate/VoiceBite transaction, your client – as a "Pre-Closing Holder" – guaranteed the accuracy of the following:

---

[1] Such notice will also be provided to additional parties, as may be appropriate and required.

- That your client was the "owner, inventor and/or author" of certain assigned intellectual property related to VoiceBite software (namely, a "comprehensive set of components of an AI voice ordering system" (*see* Company Disclosure Schedule, Section 5.9)), and that such intellectual property was not subject to "any dispute, claim, prior license or other agreement, assignment, lien or rights of any third party" or "any claim of any prior employer or third party client" of your client (Arjun Assignment Agreement, Section 3);

- That VoiceBite "owns, free and clear of any Encumbrances (other than Permitted Encumbrances), or has a valid and enforceable right to use, all Intellectual Property used or proposed to be used in connection with the operation and conduct" of its business (Checkmate/VoiceBite Merger Agreement, Section 5.9(c));

- That neither VoiceBite "nor any of its current or proposed products or services have infringed upon, misappropriated or are currently infringing upon, misappropriating or otherwise violating any Intellectual Property rights of any Person" (*Id*., Section 5.9(f));

- That "no source code for any Company Proprietary Software has been delivered, licensed, or made available" to any person "who is not an employee of the Company" (*Id*., Section 5.9(h));

- That your client would "not bring onto [VoiceBite]'s premises" any "property belonging to a former employer or any other person to whom I have an obligation of confidentiality unless that former employer or person has consented in writing" (Vasan Trade Secret Acknowledgement);

- That "[n]either this Agreement nor any agreement, attachment, schedule, exhibit, certificate or other statement delivered pursuant to this Agreement or in connection with the transactions contemplated hereby omits to state a material fact necessary in order to make the statements and information contained herein or therein, not misleading." (Checkmate/VoiceBite Merger Agreement, Section 5.19); and

- That your client was "not aware of any information necessary to enable a prospective purchaser of the Company Shares or the business of the Company and its Subsidiaries to make an informed decision with respect to the purchase of such Company Shares or business that has not been expressly disclosed herein." (*Id*).

The importance of ensuring complete and unassailable rights to purported VoiceBite intellectual property – again, a primary reason for the transaction – was repeatedly and explicitly made crystal-clear to your client. He agreed, among other things, that in the event any of these representations and warranties turned out to be inaccurate, he would take on several responsibility for "any and all claims, liabilities, obligations, damages, losses, penalties, judgments, costs and expenses (including amounts paid in settlement, costs of investigation and reasonable attorney's fees and expenses), whenever arising or incurred" arising therefrom or relating thereto. (Checkmate/VoiceBite Merger Agreement, Section 8.1(a)).

You can thus imagine that Checkmate has been beyond disturbed to learn that Mr. Vasan was much less than truthful in many of his key transaction-related representations. Rather than reflecting, as Mr. Vasan told VoiceBite and VoiceBite told Checkmate, original, proprietary and enforceable intellectual property contributions owned by your client and/or VoiceBite, much of the core VoiceBite code that is critical for the operation of its systems has instead proven to be littered with elements that have been re-used, warmed-over, registered and otherwise owned by various ***third-party*** companies and individuals.

2

For example:

- **_Deployment.txt._**  This code describes how to deploy the VoiceBite application.  **_The entirety of the document refers to the application as being called "Cyborg"_** – one of your client's previous employers.  A representative sample of that code is provided below.

- **_Deepgram.txt._**  This code provides credentials for using the Deepgram TTS, and **_also explicitly refers to Cyborg_**.

- **_Env.json._**  This code provides configuration settings for the application and **_makes dozens of references to "friendlycyborg,"_** a representative example of which is set forth below.

- **_Globals.py._**  This code provides the configurations to the rest of the application, **_incorporating the Env.json structure above_**.

Even more brazenly, there are several user interfaces within VoiceBite that have copyright headers **_changed from CyborgOps to VoiceBite_** in a commit.  A representative example is provided below.



And still more troubling evidence has come to light indicating that portions of VoiceBite code appear to have been authored and by and subject to ownership claims by yet another **third party**: Vasan Varadarajan.

```
#!/usr/bin/env python
# -*- coding: utf-8 -*-


__author__ = 'Arjun Vasan, Vasan Varadarajan'
__copyright__ = 'Copyright 2018.'
```

The import of all of this is clear. When your client assured Checkmate and VoiceBite in so many words that they were the **exclusive** and **rightful** owners of all of the **original** code at the heart of VoiceBite's technology, Mr. Vasan was either knowingly lying or was recklessly untruthful in a way that suggests not only breaches of the relevant agreements, but serious civil or even criminal misconduct. None of this is consistent with your client's obligations under his agreements and all, taken together, entitle Checkmate to compensation and disentitle your client to claim that he is owed the compensation that he claims to be owed for what he appears to consider to be some kind of "Good Reason" resignation.

We would be remiss if we did not directly address just how misguided your client is on that last point: as you know, on November 13, 2024, your client claimed that he was "resign[ing] from [Checkmate], with good reason, due to the demand made in late October that I accept a demotion, despite exceptional performance." Email from Vasan to Agrarwal dated November 24, 2024. He subsequently claimed entitlement to a "Retention Bonus" of "~475K," $72,000 in severance, $140,000 in a "Performance Bonus," certain "estimated" "Reimbursements" and "Legal Fees," for a total settlement amount of "[a]pproximately $690,000-$700,000." Your client well knows that he did not exemplify "exceptional performance" during his time with Checkmate. To the contrary, his time with Checkmate was marred by a consistent failure to demonstrate the professionalism and conduct expected of company executives and to comply with the company's culture of courtesy and professionalism. The end of your client's employment came as a result of his own inability to conduct himself with appropriate professionalism; it is **your client** that owes Checkmate significant funds arising out of his obligation to indemnify Checkmate for losses arising out of his conduct, and it is your client who must and will pay for those losses and do so immediately. For these and other reasons, Checkmate (a) rejects your client's "Good Reason" resignation; and (b) further rejects the purported "settlement" demand as outrageous and unsupported under the circumstances.

In light of the results of Checkmate's ongoing investigation into the foregoing significant concerns regarding your client's conduct, together with the misrepresentations regarding the ownership of and rights to VoiceBite's intellectual property, Checkmate has no intention to make any more payments to your client at this time. *See* Checkmate/VoiceBite Merger Agreement, Section 3.3 ("Each of Purchaser, Merger Sub and the Surviving Corporation will be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as it reasonably determines in good faith it is required to deduct and withhold with respect to the making of such payment under the Code, or any other applicable Law."). Rather, Checkmate expects **your client** to provide **Checkmate** with immediate reimbursement for all of Checkmate's related out-of-pocket expenses associated with the Merger Agreement and otherwise including, but not limited to, attorney's fees, reimbursement expenses, and other related costs incurred.

Please let us know if you have any questions regarding the foregoing.  Otherwise, nothing herein is intended to be, nor should it be construed as, a waiver or limitation of any of Checkmate's or VoiceBite's rights, claims or defenses in this matter, all of which are and will remain expressly reserved.

Very truly yours,

Ryan Q. Keech

# EXHIBIT Z


## Clarification Regarding Prior Statements
1 message

**Arjun Vasan** <arjun.vasan@gmail.com>                                           Wed, May 7, 2025 at 7:46 AM
To: "Chiu, Stacey G." <Stacey.Chiu@klgates.com>, "Huey, Gabriel M." <Gabriel.Huey@klgates.com>

Hi Stacey and Gabriel,

I want to briefly address my earlier comments, particularly the references I made about "crushing" or "ruining" anyone or anything. Those statements were made out of frustration under significant stress, and I regret them. They do not represent my actual intentions, strategy, or approach to this litigation.

My objective remains straightforward: to ensure a fair and just resolution of this dispute in accordance with applicable law and the meet and confer process. While I vigorously disagree with the actions taken against me and intend to continue pursuing all legal remedies available, my approach has not and will not be personal or vindictive.

Accordingly, and for the record, I fully retract these statements.

Best regards,

Arjun