UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

CHECKMATE.COM, INC.,
                     Plaintiff,

               -against-

ARJUN VASAN,
                    Defendant.

------------------------------------------------------- X

**25-CV-03181** (JMF)

<u>DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS, TRANSFER OR STAY THESE PROCEEDINGS; MEMORANDUM OF LAW</u>

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ...................................................................................................... 2

    A.   *Defendant's Evidence Should Be Considered*................................................. 2

    B.   *Plaintiff's Withheld Documents Reveal Fatal Defects*................................... 3

    C.   *The Non-Competition Agreement ("NCA") is Still Not Breached* ............... 4

        1.   The Agreement is Ambiguous and Possibly Unenforceable. ...................... 4

        2.   No Competitive Activity is Alleged—Only Exploratory Emails. .............. 4

        3.   No Code or Proprietary Material was Shared. ........................................... 4

    D.   *The Amended Complaint Still Falls Short of Rule 9(b)* ................................ 5

        1.   The AC Lacks Temporal or Geographical Specificity ............................... 5

        2.   The AC Fails to Plead Individual Fraud .................................................... 6

        3.   The AC Fails to Specify Damages.............................................................. 7

        4.   The Remaining Fraud Elements Are Equally Lacking ............................... 8

    E.   *Technical Unsophistication Undermines the Amended Complaint* ............... 9

III.  CONCLUSION.................................................................................................. 10

## I.    INTRODUCTION

Plaintiff's claim that it "seeks to hold Defendant ("**_D_**") accountable for his, and only his, actions," is flatly contradicted by its own pleadings. See Opposition ("Opp") at 26. In ¶¶ 33–34, the Amended Complaint ("AC") misattributes to **_D_** an argument actually made by *joint* counsel for all VoiceBite ("VB") shareholders in response to its own demand letter—laying bare its scheme to assign group conduct to **_D_** individually. See Exhibit B. Neither the AC nor the Opp name any other human participant in the transaction from VB or Checkmate ("CM"), describe the VB team's roles and ownership, or plead any facts clearly unique to **_D_**. These omissions remain fatal in a merger context under Rules 12(b)(6) and 9(b).

Moreover, the Merger Agreement ("MA") expressly requires all claims *arising from or relating to* the transaction be brought through the Holder Representative for all pre-closing holders and be subject to liability caps. Nothing in the MA permits Plaintiff ("**_P_**") to target a single shareholder for piecemeal litigation. Thus, if the Court accepts, *arguendo*, that **_P_** may individually target **_D_** for the collective team conduct at issue, it must then accept that **_P_**'s claims *do not arise from the MA* and are therefore not subject to the MA's forum provisions. As **_P_** has effectively conceded a lack of personal jurisdiction and proper venue absent the forum provision, it necessarily follows that the Court must dismiss or transfer this action under Rules 12(b)(2, 3).

But this Court should emphatically reject **_P_**'s attempt to collapse individual and group, as one can only be responsible for one's own actions. The only alleged misrepresentations in the AC are *contract provisions*, all executed on close. These terms were negotiated jointly, all disclosures were made jointly, and *all code was transferred from VB to CM*, not from **_D_** to CM. **_P_** has failed to allege any actions taken by **_D_** personally, requiring dismissal under 12(b)(6).

**_P_**'s shareholder Notice of Claim ("NoC"), which it seeks to exclude, asserts forfeiture of the entire team's bonuses, citing the *very same conduct* alleged against **_D_** here. **_P_** entirely fails to rebut the Motion's Rule 12(b)(7) and 19 arguments. Not only are the rights of all VB founders under threat, by isolating **_D_**, **_P_** seeks to win not on the merits but with asymmetric advantage, making this case paradigmatic for required joinder. See Exhibit B.

***P*** fundamentally mischaracterizes "the code" as one indivisible asset, betraying its argument's technical unsophistication. VB's innovative product was built on Large Language Model AI (LLM), a technology only available after the founders were free of any and all obligations to prior entities. See RJN re LLM Technology. While ***P*** fixates on scraps of legacy code, it does not rebut ***D***'s contention that ***P*** continues to benefit from and develop this LLM codebase, with the VB team mostly intact and launching major customers.

***P***'s defense of its fraud, breach and non-compete allegations is unpersuasive; it fails, for example, to distinguish sufficiently between statements and actions before and after key events such as merger close, or ***D***'s termination, when obligations and rights were entirely different—a defect that is dispositive under Rule 9(b). Moreover, where the alleged victim appears to thrive as a result of the very transaction it claims was fraudulent, courts require more than a promise to plead damages later. In sum, ***P***'s case is riddled with issues that go beyond technical pleading.

Finally, ***P*** has not addressed its withholding of key documents until its opposition, its false assertions of Texas residency, or its ongoing pattern of bad faith conduct in the CD Cal. Action—conduct that it now seeks to import to this Southern District of New York ("SDNY"). ***D*** respectfully requests the Court remain skeptical of ***P***'s shifting theories and tactical maneuvering and deny ***P*** any benefits from its own misconduct.

## II.    ARGUMENT

### A.    Defendant's Evidence Should Be Considered

While Rule 12(b)(6) generally limits the Court to the four corners of the complaint, ***D***'s motion also invokes Rules 12(b)(1)-(5), 12(b)(7), and Rule 19, all of which permit and often require the Court to consider evidence outside the pleadings.[1] Moreover, the Court may, even under 12(b)(6), also consider documents relied on in the Complaint (even if not attached), integral to the complaint or any judicially noticeable evidence. For example, ***P*** objects to the NoC as outside the pleadings. Not only is the NoC central to ***D***'s arguments on multiple levels,

---

[1] See, e.g., *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (subject matter jurisdiction); *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (personal jurisdiction); *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 113–14 (2d Cir. 2010) (venue); *Delta Financial Corp. v. Paul D. Comanduras & Assocs.*, 973 F. Supp. 2d 282, 294 n.5 (S.D.N.Y. 2013) (indispensable party).

but it is *expressly relied on in the pleadings*. In ¶¶ 33-34, the AC distorts a nuanced argument by joint counsel on behalf of VB shareholders into an alleged personal admission by **_D_**. Therefore, the Shareholder Response and the NoC to which it replied are ripe for this Court's consideration.

    **_D_** further submits declarations for himself and his father, Vasan Varadarajan ("VV"), a key figure in the AC with alleged 3rd party claims. The vast majority of the declared statements are relevant to jurisdiction, venue or joinder and are admissible for consideration under Rules 12(b)(1-5 and 7) and 19.[2] Accordingly, the Court may and should consider the filed declarations and attached exhibits for all purposes except as strictly limited by Rule 12(b)(6).

    B.  <u>Plaintiff's Withheld Documents Reveal Fatal Defects</u>

    For six months —including the weeks preceding this motion—**_D_** sought copies of the contracts at issue. **_D_** raised this matter in his CA Comp., expressly alleging that **_P_** and its counsel refused to provide the very documents forming the basis for their claims. See CA Compl. ¶ 57.

    **_P_** refused to produce two of three allegedly breached contracts until its Opp, therefore failing to provide fair notice so that **_D_** might mount a proper defense. Due to the complexity of the transaction, and the integrated nature claimed, if a plaintiff actively withholds operative documents and only belatedly "finds" them in opposition, dismissal is the required remedy:[3] the Complaint was—and remains—fatally deficient. Moreover, **_D_** strongly disputes the validity of the two withheld documents, alleged in his Cal. Cmpl. to have resulted from fraud and coercion.

    **IP Acknowledgement**: As it turns out, the IP letter is fatally defective—bear in mind this document was never provided to the founders after it was allegedly signed. The actual contract does not confer *any* obligations on **_D_**, as while alleged to be signed by him, it names Christopher Lam ("CL") as the subject in what **_P_** calls a *typo*. This sloppy drafting confirms the founders were given identical terms, which, as discussed, they had jointly negotiated. See Warns Decl. ¶5.

---

[2] To the extent **_D_**'s declarations include statements relevant specifically to Rule 12(b)(6), such as **_D_**'s father confirming awareness and approval of use of coauthored code, **_D_** offers these solely for context regarding VV's centrality as a California witness with intimate technical understanding of the matters at hand. Indeed, as the only human actor other than **_D_** in the AC. VV's age and health issues limit travel. **_D_** acknowledges the Court may disregard these limited statements for purposes of Rule 12(b)(6), while fully considering them under Rules 12(b)(1)-(5), (7), and 19.

[3] The purpose of Rule 9(b) is threefold — ... fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect a defendant against the institution of a strike suit. See *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991); *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).

**Assignment Agreement:** As **_D_** suspected, this contract was executed solely between himself and VB; **_P_** *was not a party*. The counterparty was Robert Nessler, **_D_**'s cofounder and the CEO of VB. **_D_** disputes the agreement's enforceability altogether; in any event, it cannot be "part of the transaction," as Nessler was no longer CEO when **_D_** executed the transaction and it neither references nor is referenced by the MA. Moreover, as **_P_** concedes, the VB founders—including **_D_**, Lam and Nessler—discussed the code at issue, with counsel, and deemed it immaterial. A fraud claim cannot arise where both parties possess equal knowledge.[4]

C. The Non-Competition Agreement ("NCA") is Still Not Breached

**_P_**'s Opp claims it has adequately pled a breach of the NCA but fails to engage with **_D_**'s central arguments or the underlying documentary record. See Warns Decl. Dkt. 40-4 at 2.

*1.   The Agreement is Ambiguous and Possibly Unenforceable.*

**_P_** has never clarified the ambiguous definitions of "Company" and "Business." The non-compete refers to "VoiceBite" as "Company," and is conditioned on future employment with "Company"—a condition never met, as **_D_** was only ever employed by *Checkmate*. "Business" is defined as VB's "existing phone and drive through ordering business,". But being a few months old, VB had no customers, and **_P_** admits it purchased VB to enter the voice AI market. *Id.*

*2.   No Competitive Activity is Alleged—Only Exploratory Emails.*

**_P_** alleges no solicitation or loss of employees or customers, no disclosure of proprietary information, and no business lost as a result of any alleged conduct. The entire claim rests on two emails, already before the Court in CD Cal Dkt. 18-1, which show **_D_** conditioned his availability on exiting his non-compete.  **_P_** cannot allege otherwise, as nothing else occurred. See Exhibit E.

*3.   No Code or Proprietary Material was Shared.*

The emails confirm no source code was sent—only old demo audio recordings from a prior company (CyborgOps), now **_D_**'s personal property. **_P_**'s vague claim that **_D_** "alluded" to selling "the same code and employees" is unsupported and cannot ground a claim. The agreement does not prohibit "attempting to solicit competitors." There was no breach.[5]

---

[4] See *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278 (2011).
[5] **_D_**'s section on the non-compete being void under its own terms is meant to support Declaratory relief that the agreement is void post termination, not to contest **_P_**'s existing non-compete claim.

D.  <u>The Amended Complaint Still Falls Short of Rule 9(b)</u>

The Second Circuit has long required a fraud plaintiff to specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent.[6]  Rule 9(b) thus obliges a complaint to supply—**for each alleged misrepresentation or omission**—the classic "who, what, where, when, why, and how."  Conclusory or group-pleaded allegations are not enough.  For claims sounding in fraud, the heightened standard is particularly necessary so defendants may discern which precise statements are alleged to be actionable. See Exhibit C.

*1.  The AC Lacks Temporal or Geographical Specificity*

**_P_**'s Opp argues its broad reference to "the spring of 2024" suffices under 9(b), but the governing cases reject exactly that sort of imprecision[7]. Neither of **_P_**'s cited decisions—*In re Bristol-Myers* and *Rana v. Islam*—supports its vague approach. Both involved alleged misstatements or omissions linked to *specific, publicly documented dates or periods*, giving defendants and the court clear notice of what conduct was at issue. Here, by contrast, **_P_** lumps alleged statements into an amorphous "spring 2024" window, forcing **_D_** and the Court to guess whether the supposed fraud occurred *before* the April 30 closing (when inducement might be possible), or *after*—when entirely different duties would apply.[8] See Exhibit D.

Similarly, in ¶ 22 of the AC **_P_** claims, "in the fall of 2024" **_D_** "variously alternated" between litigation threats and team morale concerns, but the given quotes mean something entirely different when understood as in the wake of an acrimonious separation. **_P_**'s deliberate vagueness serves to mask the truth. **_D_** was wrongfully fired on medical leave Nov 14, 2024, and appropriately threatened to sue for unpaid compensation—"fall 2024" is insufficiently particular.

---

[6] See *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Olsen v. Pratt & Whitney Aircraft Div.*, 136 F.3d 273, 275–76 (2d Cir. 1998); *Telenor E. Invest AS v. Altimo Holdings*, 567 F. Supp. 2d 432, 441 (S.D.N.Y. 2008); and *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

[7] See *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629 (E.D.N.Y. 2003)(four-month period too vague); *Skylon Corp. v. Guilford Mills, Inc.*, 1997 WL 88894 (S.D.N.Y. Mar. 3, 1997)(four-month window fails 9(b)); and *Sendar Co. v. Megaware Inc.*, 705 F. Supp. 159 (S.D.N.Y. 1989)(two-month span insufficiently pinned down).

[8] In reality, **_P_**'s allegations point only to routine representations and warranties signed as part of the closing. **_P_**'s ambiguity is a transparent attempt to disguise jointly-negotiated contract terms as acts of individual fraud—an approach foreclosed by Rule 9(b) and Second Circuit precedent. Notably, the word "Spring" does not appear in the AC.

With regards to geography, **_P_** relies entirely on **_D_**'s statement made in response to its AC. But **_P_** cannot cure its failure to plead "where" by borrowing details from **_D_**'s brief. The sufficiency of a complaint is determined based solely on the facts alleged within its four corners. See *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). **_P_**'s attempt to rely on **_D_**'s own description of events defines its failure to meet basic pleading standards.

### 2.  *The AC Fails to Plead Individual Fraud*

**_P_**'s claim that **_D_** orchestrated a fraudulent scheme is conclusory and contradicted by its own pleadings.[9] **_P_**'s original complaint omits his *cofounders* entirely and implies that **_D_** single-handedly founded, recruited, built and sold VB. The AC admits the cofounders exist but fails to allege key facts, including **_D_**'s actual ownership stake in VB—one third—and fails to specify who led negotiations, given **_D_** was not the CEO but the Chief Technology Officer (CTO).[10]

Indeed, **_P_** fails to rebut **_D_**'s assertion that he neither handled corporate disclosures nor managed the data room—tasks conventionally handled by the CEO or COO. **_P_** thus offers no factual basis for attributing specific omissions or misrepresentations to **_D_** alone. **_D_** does not seek to assign blame to his cofounders, only to highlight **_P_**'s fundamental pleading flaw: it provides no particularized allegation distinguishing **_D_**'s actions from those of the other founders.

**_P_** also did not rebut **_D_**'s assertion that the allegedly infringing code was discussed between the founders on counsel's advice and determined to be non-material—and that **_D_** was advocating—internally and *directly to **_P_***—those certain disclosures and representations needed to be updated for full accuracy. After a hostile reaction to these requested updates, discussed at length in **_D_**'s CD Cal Complaint, it was the team's consensus to proceed without demanding the changes be made. **_P_** not only fails to deny these claims, but it also seems indeed to affirm they are accurate, quoting and relying on them to support its argument. See AC ¶¶ 4, 17 and 35.

---

[9] See *Fed. R. Civ. P. 9(b)* (requiring particularized pleading as to the circumstances constituting fraud or mistake); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (complaint must state with particularity facts giving rise to a strong inference of defendant's own misconduct); *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011) (liability attaches only to one with ultimate authority over the statement or omission); *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 530 (S.D.N.Y. 2007) (A defendant may not be held liable for statements or omissions in which he had no personal involvement.); *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999) (rejecting bootstrapping of group conduct onto individual defendant absent particularized facts).

[10] The vast majority of **_D_**'s time was spent on product and engineering, not negotiating or reviewing documents.

The crystallizing evidence on whether **_P_**'s complaint holds up under 12(b)(6) and 9(b) is found in ¶¶ 33-34 of its AC, which brazenly and falsely alleges as follows:

> In February 2025, Vasan's excuses shifted yet again. This time, *he claimed that the software, the code—the heart of VoiceBite—was not, in fact, intellectual property…*

**_Defendant_ never made any such statement.** See Exhibit B.

The nuanced argument from which this allegation is derived was made, in reality, by *joint counsel* for five VB shareholders, in a formal response to **_P_**'s NoC[11]—a response in which **_D_** played no separate or unique role (nor did he sign any engagement letter). See Vasan Decl. ¶ 3; Exhibit B. **_P_** seeks to litigate against one individual for collective acts, while preventing a joint strategy and resources to mount a proper defense.

### 3.  The AC Fails to Specify Damages

The NoC also lays bare **_P_**'s repeated assertions—both here and in the Cal. Action—that it paid "millions of dollars" in the transaction. The NoC confirms the same deal structure presented in documents **_P_** attaches. VB was purchased for 321,199 shares of CM, termed the "merger consideration" (see MA) and valued at $131,815 and apportioned to the founding team according to their share of VB. The $1.5 million in retention bonuses for the team, *was earned through employment*—and is overdue, *unpaid* and now (along with equity) *deemed forfeited* by **_P_**.

In other words, for less than two months of salary worth of illiquid equity, that it now deems forfeited, **_P_** asserts its right to claw back earned compensation and enforce non-competes and forum selection in violation of California law, which governs **_D_**'s employment by contract. There is no dispute as to **_D_**'s *existing* contractual entitlement to $620,000 in severance and bonuses, which is why **_P_** seeks "disentitlement" here as a remedy. See AC ¶¶ 68, 70. **_P_** has yet to show a single dollar of damages, let alone enough to balance its existing obligations.

Critically, four of the original five VB founders are still employed by **_P_**, developing the voice product and launching major customers (despite their bonuses being withheld expressly on

---

[11] **_P_** alleges it "had been duped into acquiring a valueless non-asset," and paid millions of dollars for it. AC ¶¶ 33, 59. The Notice asserted forfeiture of $1.5 million in bonuses earned by the VB team through employment, and all equity earned through the merger. The bonuses represent the "millions of dollars" **_P_** flashes throughout its filings, which as its own filed documents confirm was to be earned through employment yet remain unpaid despite every trigger being satisfied—a fact which **_P_** has not disputed and cannot dispute.

account of this dispute). **_P_** has not alleged product failure, a third-party lawsuit, reputational damage or any other costs it incurred as a result of the disputed portions of the codebase. Likely, if **_P_** were truly concerned about third-party claims, it would have replaced the disputed code prior to filing this action. Yet it has not alleged re-writing code as a mechanism for damages. It only makes vague allegations that it would have paid less for VB were it not for the alleged fraud. Yet according to the contracts it has produced, and its own demand letters, _it didn't pay anything for VB_. Hence no damages are possible, and the claims are foreclosed.

### 4.   The Remaining Fraud Elements Are Equally Lacking

(a) **Knowledge of Falsity**: **_P_** relies on the conclusory claim that **_D_** "knew" some code was co-authored by his father—insufficient under Rule 9(b) and binding authority, which require facts showing **_D_** both (1) recognized the code's authorship created a material risk for **_P_**, and (2) intended to mislead **_P_** regarding that risk. Here, **_P_** never alleges **_D_** believed or represented the code was not assignable to VB, or that he personally concealed its origins. The provenance of all code—including any legacy code—was openly discussed among the founders, and there is no plausible allegation that authorship by a family member, openly known and approved, created any undisclosed legal risk or claim. Mere knowledge of authorship is not fraudulent intent.[12]

(b) **Actual and Reasonable Reliance**: **_P_** fails to allege with particularity how or why it reasonably relied on any supposed misrepresentation by **_D_**. It does not specify who made those representations, who was responsible for disclosures or why reliance would be reasonable in the context of collective negotiations among all founders and shared counsel. There is no allegation that **_P_** conditioned closing on exclusive code ownership, nor that it undertook any diligence to confirm authorship. Bare assertions that **_P_** "would have paid less" or declined the deal are insufficient—especially if **_P_** had every chance to condition the merger accordingly and did not.

(c) **Intent to Defraud**: **_P_**'s claims of "evasiveness" fail to allege with particularity who asked for the code, when, and what **_D_** supposedly withheld. **_D_** complied with all _supervisor_

---

[12] See _Lerner v. Fleet Bank, N.A._, 459 F.3d 273, 290–91 (2d Cir. 2006) (To satisfy Rule 9(b), a complaint must allege facts that give rise to a strong inference of fraudulent intent.); _Cohen v. S.A.C. Trading Corp._, 711 F.3d 353, 359 (2d Cir. 2013); _First Nationwide Bank v. Gelt Funding Corp._, 27 F.3d 763, 769 (2d Cir. 1994) (Where the complaint on its face reveals that the plaintiff's alleged loss was not caused by the defendant's misrepresentations, dismissal is proper.); _Ashcroft v. Iqbal_, 556 U.S. 662, 678 (2009) (Threadbare recitals of the elements or conclusory statements, do not suffice.).

requests regarding code access. "Evasiveness" is not fraud—especially where **_P_** does not plead any specific instance of dishonesty, concealment, or bad faith. At most, **_D_** declined DevOps[13] requests during employment, an engineering judgment about priority, not evidence of intent to deceive. **_D_** does not recall, and **_P_** does not allege, being asked for a code review prior to merger close—which would have been the proper way to handle any concerns about code provenance.

(d) **Materiality of Alleged Misrepresentations**: The Opp does not actually allege the code was material to the transaction; it simply asserts that "the code" was important and that the market was large. But market opportunity is not materiality. *The important (LLM) code was all new*. Further, teams, not code, are often the primary asset in early-stage acquisitions, as code can be rewritten or replaced. **_P_**'s exhibits show that the merger was conditioned on the VB team agreeing to employment, with retention and performance bonuses. **_P_**'s press releases about the merger confirm the expertise of the main founders—Nessler, Lam and **_D_**—was primary.

E. <u>Technical Unsophistication Undermines the Amended Complaint</u>

**_P_** makes bold claims about misuse of third-party IP, when it has no third-party claim to point to and therefore no standing to claim infringement. Moreover, **_P_** has not alleged any facts demonstrating that **_D_** did not have the necessary rights to use any code that was used. The AC asserts in ¶ 24 that parts of the codebase dated back to 2018, which it notes was prior to the formation of VB. It then alleges that **_D_** had "obligations to other entities" at that time, without explaining or pointing out the entities or obligations in question.[14]

As shareholder counsel argued in his response to **_P_**'s Notice, it is likely that under recent Supreme Court precedent, this functional code would not be considered protectable as IP under copyright. Counsel did not argue that *none* of VB's code was IP, just not the code alleged to be infringing configuration files, API integrations, audio utilities and credential files. See Ex. B. The LLM Native AI VB built and sold, and that the founders considered VB's IP, is currently

---

13 "DevOps" refers to the technical team responsible for managing software infrastructure, code deployment, and system operations, but not typically involved in company leadership or high-level business decisions.

14 Notably, **_P_** was provided, in due diligence, a recission and release novating any obligations that existed from 2018 to 2021 and granting unlimited license to **_D_** to use any of his own related work up to that time. **_D_**'s father, VV, a longtime collaborator and advisor was fully aware and approved of **_D_**'s use of co-authored functional modules for VB.

live as the foundation of CM's Voice AI product. Therefore, VB's IP was neither infringing nor was it a valueless non-asset. It was simply separate from the disputed code.

**_P_**'s fraud theory is rendered incurable by the undisputed, rapid evolution of LLM technology, as set forth in the Request for Judicial Notice filed herewith. VB's innovative LLM based product could not have been developed prior to 2023, and the underlying technology (e.g., ChatGPT, its API and its progeny) was not generally available until **_D_** and his cofounders had left all prior ventures and terminated any conflicting obligations. See Exhibit A. The allegedly infringing legacy code at issue here was irrelevant to LLM functionality and not material to the transaction. The fact that **_P_** continues to develop and profit from the VB LLM platform, with the original team mostly intact, further refutes any plausible claim of deception or harm.

## III.    CONCLUSION

In the Central District of California, **_P_** tried to defeat venue by inventing Texas residency, exaggerating "New York contacts", insisting "nothing relevant occurred in California". In this Court, however, it abandons all such factual arguments, resting its jurisdiction and venue arguments on a single provision: § 9.7(b)'s forum-selection clause. By doing so, **_P_** tacitly concedes that *absent that clause, there is no personal jurisdiction over **_D_** and no connection between this private wage dispute and the Southern District of New York, thus no proper venue.*

This Court has numerous ways to find § 9.7(b) inapplicable, including the actual text of the MA § 7-9, California law and the doctrine of equitable estoppel: a party that has for all intents and purposes abandoned a transaction cannot seek to enforce one self-serving provision while disregarding all the bargained for provisions that might benefit **_D_**.

**_P_**'s theory of the case is further undermined by the retaliatory animus and lack of candor on display both here and in CA. The seemingly intentional vagueness of the AC and Opp forecloses any possibility of meeting Rule 9(b) standards. The non-compete was not breached by **_D_**'s emails. **_P_** fails to rebut **_D_**'s non-joinder argument entirely and its position that § 9.1 is not mandatory for the AC's claims is unpersuasive. **_D_** respectfully requests that this Court reject **_P_**'s self-serving and *ad hominem* arguments, and grant relief as specified in his [Proposed] Order.

Respectfully Submitted,[15]

/s/ *Arjun Vasan*

**Dated**: Monday, June 23, 2025,

In **Cerritos, California**[16]

_____

**Arjun Vasan**
[**_D_**]efendant *Pro Se*
arjun.vasan@gmail.com
(562) 900-6541

---

[15] Remarkably, ***P***'s Opp asserts that the Cal. Action—filed reluctantly to recover unpaid compensation, was somehow anticipatory of its instant action. This is contradicted by the logistics of this dispute: on one hand, a former employee seeking to recover undisputed and earned pay, and on the other, his former employer, who seeks a declaration—from this court—to avoid paying the same.

[16] While ***P*** corrected the address and removed references to Texas residency in the AC, it did not show good cause as to why this required a MQ, when ***D*** had been repeatedly—by direct contact with counsel and in court filings—provided notice of the inaccuracy. ***D*** re-affirms his request, respectfully, for the Court to order ***P*** to explain for the record why it persisted with the Sugar Land, Texas address only until close of briefing in CD Cal.

# EXHIBIT A

**Exhibit A** – Key Event Timeline

**Nov 2022** – OpenAI launches ChatGPT (GPT 3.5) to the public, gains rapid adoption

**Feb 2023** – ChatGPT named fastest growing application in history

**Mar 2023** – OpenAI API for GPT 3.5-turbo launches, first conversational foundation model available for developers to integrate LLMs into their own applications. Notable Improvements include latency low enough for real time response (voice applications), context windows sufficiently large to handle restaurant menus, dramatic reductions in hallucinations and general improvement in output quality.  AV and RN leave Presto, begin to brainstorm pure LLM voice ordering – their previous efforts (kea, CyborgOps, Presto) all were dependent on Human in the Loop assisted AI. **VoiceBite now possible.**

**Aug 2023** – AV and RN incorporate VoiceBite, begin business development using AV and VV's legacy personal Voice project to bootstrap customer demos.

**Nov 2023** – CL joins AV and RN, and the VoiceBite founding team begins working on their new LLM system. (CL is Christopher Lam)

**Jan 2024** – Negotiations begin with Checkmate for Merger with VoiceBite.

**Mar 2024** – OpenAI API for GPT 4.0-turbo launches with high quality, low latency and affordable prices that dramatically increase automation possibilities.

**Apr 30, 2024** – Merger Closes.

**May 1, 2024** – Employment Begins at Checkmate.

**Nov 14, 2024** – AV terminated by Checkmate while on medical leave.

**Jan 28, 2025** – AV files suit in C.D. Cal. for wrongful termination, retaliation and fraud.

**Feb 14, 2025** – Checkmate files this suit in New York State Court.

# EXHIBIT B

**Exhibit B** – Shareholder Notice and Surrounding Events

**January 28, 2025**: Defendant Arjun Vasan files *Arjun Vasan v. Checkmate.com, Inc.* 2:25-cv-00765-MEMF-JPR in the Central District of California. RJN Ex. A.

**January 29, 2025**: (1pm) Vasan files ethics complaint with K&L Gates General Counsel's Office, alleging misconduct by Attorney Keech in his representation of Checkmate. Ex. G.

**January 29, 2025**: (evening) Keech sends Shareholder Notice of Claim, to the Holder Representative, asserting forfeiture of merger consideration and $1.5m in team bonuses.

Robert Nessler (as Holder Representative)
1149 Hollyhead Lane
Cupertino, California 95014
robertnessler@gmail.com

**Re:    VoiceBite Corporation/Indemnification Notice of Direct Claim**

Dear Holder Representative:

Reference is made to that certain Agreement and Plan of Merger, by and among Checkmate.com Inc. ("Purchaser"), VoiceBite Merger Sub, Inc., VoiceBite Corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative"), dated as of April 30, 2024 (the "Merger Agreement"). Capitalized terms not otherwise defined herein have the meaning set forth in the Merger Agreement.

*Figure 1 - Addressed to the Holder Representative and all Five Founding Shareholders*

While the Purchaser Indemnified Parties' investigation is ongoing, the Purchaser Indemnified Parties state that Purchaser Losses comprising the Subject Claim is an amount in excess of **$5,000,000**. For purposes of this indemnification claim only, Purchaser Indemnified Parties are making an indemnification claim for Purchaser Losses of **$1,681,815** and expressly state and do not waive non-indemnification claims that include and/or are in excess of these amounts.

Purchaser shall seek recourse for the Indemnifiable Amounts as set forth below:

- Forfeiture of Final Payment Amounts (as defined in the Bonus Agreement):    **$200,000**

- Surrender of 321,199 Purchaser Closing Shares:    **$131,815**

- Forfeiture of Retention Bonus amounts (as defined in the Bonus Agreement):    **$1,350,000**

This Indemnification Claim Notice is a Notice of Claim as set out in Section 8.3(c) of the Merger

*Figure 2 - Plaintiff Asserts Forfeiture of All VoiceBite Retention Bonus Just 17 days Prior to Filing in NY Against Defendant.*

**January 31, 2025**: Charles Tea III from K&L Gates GC Office responds, requesting materials to support Vasan's allegations, which are promptly provided.

**Exhibit B** – Shareholder Notice and Surrounding Events

**February 06, 2025**: The shareholders engaged a joint counsel, who drafts a response to the Shareholder Notice. The full draft is attached as Exhibit B.1.

agreement. The code at issue is merely scènes à faire or API integrations not subject to copyright or intellectual property protection. As the code is functional in nature, the code itself is merely elements dictated by functionality, and therefore cannot be subject to protection and thus are not subject to claims for indemnification based violations of Sections 5.7, 5.9, and 5.19.

*Figure 3 - VoiceBite Shareholder Response to Notice of Claim*

**February 14, 2025**: Checkmate files against Defendant, individually in NY State Court (now removed to SDNY). This complaint, like the Amended Complaint later, misattributes the Feb 6 shareholder response to Defendant ***personally***.

33.    In February 2025, Vasan's excuses shifted yet again.  This time, he claimed that the software, the code – the ***heart*** of VoiceBite – was not, in fact, intellectual property – emphasizing the stark and troubling reality that Checkmate had been duped by Vasan into acquiring a valueless non-asset.

34.    Of course, Checkmate would not have agreed to acquire VoiceBite if its core technology was not, in fact "intellectual property."  Vasan's misrepresentations regarding the

*Figure 4 - Amended Complaint ¶33, 34*

**February 17, 2025**: Defendant requests an update from Charles Tea, who defers, but does not disclose the newly filed lawsuit.

**February 21, 2025**: Tea formally responds and dismisses ethics allegations and again fails to disclose the NY action. See Exhibit G.2 – Formal Letter Responding to Ethics Allegations

the notice of claim against the voicebite shareholders, the shareholder response, and the email thread containing them are re-attached here for convenience.

 Gmail

**Arjun Vasan <arjun.vasan@gmail.com>**

---

## Letter to Shareholders Representative/ Draft Response
4 messages

**Grant Thomas** <gthomas@twtlaw.com>
To: Arjun Vasan <arjun.vasan@gmail.com>

Thu, Feb 6, 2025 at 7:36 PM

Hello Arjun,

As promised attached is the Letter to the Shareholder's Representative and my draft response. If you have any questions or comments, please reach out. I was planning on sending this to K&L Gates tomorrow.

Best,
Grant



**Grant Thomas**
**Associate**
18101 Von Karman Avenue , Suite 230
Irvine, CA  92612

☎  949.679.6400

🖷  949.679.6405

✉  gthomas@twtlaw.com

 www.twtlaw.com

===========================================================

CONFIDENTIALITY NOTICE:

This electronic mail message and any attached files contain information intended for the exclusive

use of the individual or entity to whom it is addressed and may contain information that is

proprietary, privileged, confidential and/or exempt from disclosure under applicable law.  If you

are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or

distribution of this information may be subject to legal restriction or sanction.  Please notify

the sender, by electronic mail or telephone, of any unintended recipients and delete the original

message without making any copies.

========================================================

---

**2 attachments**

 **2025-01-29 Ltr. to Holder Representative re Direct Claim (1).pdf**
287K

 **2025.02.07 VoiceBite Shareholders' Response to January 29, 2025 Letter in re Indemnification.docx**
75K

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Thu, Feb 6, 2025 at 10:05 PM
To: Grant Thomas <gthomas@twtlaw.com>

Hi Grant,

Looks good. Shouldn't we also demand payment of the withheld bonuses?

- Arj
[Quoted text hidden]

---

**Grant Thomas** <gthomas@twtlaw.com>                                     Thu, Feb 6, 2025 at 10:06 PM
To: Arjun Vasan <arjun.vasan@gmail.com>

Hi Ari,

We will it's just going to be in a separate letter. We'll send this first.

Best,
Grant

Get Outlook for iOS

**From:** Arjun Vasan <arjun.vasan@gmail.com>
**Sent:** Thursday, February 6, 2025 10:05:06 PM
**To:** Grant Thomas <gthomas@twtlaw.com>
**Subject:** Re: Letter to Shareholders Representative/ Draft Response

[Quoted text hidden]

---

**Arjun Vasan** <arjun.vasan@gmail.com>                                    Thu, Feb 6, 2025 at 10:33 PM
To: Grant Thomas <gthomas@twtlaw.com>

Sounds good, thanks!
[Quoted text hidden]



January 29, 2025

Ryan Q. Keech
Partner
Ryan.Keech@klgates.com

**VIA ELECTRONIC MAIL ONLY**

T +1 310 552 5070
F +1 310 552 5001

Robert Nessler (as Holder Representative)
1149 Hollyhead Lane
Cupertino, California 95014
robertnessler@gmail.com

**Re:     VoiceBite Corporation/Indemnification Notice of Direct Claim**

Dear Holder Representative:

Reference is made to that certain Agreement and Plan of Merger, by and among Checkmate.com Inc. ("Purchaser"), VoiceBite Merger Sub, Inc., VoiceBite Corporation (the "Company"), Robert Nessler, Arjun Vasan, Christopher Lam, Isamu Aoki and Paul Justin Garcia (each a "Stockholder" and collectively the "Stockholders"), and Robert Nessler as representative of the Pre-Closing Holders (the "Holder Representative"), dated as of April 30, 2024 (the "Merger Agreement"). Capitalized terms not otherwise defined herein have the meaning set forth in the Merger Agreement.

Pursuant to Section 8 of the Merger Agreement and in accordance with Section 8.3(c) of the Merger Agreement, Purchaser and certain indemnified affiliates, as those terms are defined (collectively, "Purchaser Indemnified Parties"), hereby provide to you, in your role as Holder Representative, this notice of Direct Claim and indemnifiable Losses with respect to certain matters under the Merger Agreement.

\*          \*          \*

Following the Closing, Purchaser Indemnified Parties were made aware of serious conduct involving, *inter alia*, breaches of certain representations and warranties made by the Company and its affiliates, which breaches resulted in Losses to Purchaser. Although Purchaser's investigation is ongoing, Purchaser has determined that the Company and/or certain of its affiliates knowingly, willfully and fraudulently breached at least the following representations and warranties made by it in the Merger Agreement, resulting in significant damages and other Losses to Purchaser (collectively, the "Subject Claims"):

- Section 5.7, Title to and Sufficiency of Assets
- Section 5.9, Intellectual Property
- Section 5.19, Disclosure

K&L GATES LLP
10100 SANTA MONICA BOULEVARD  EIGHTH FLOOR  LOS ANGELES  CA 90067
T +1 310 552 5000  F +1 310 552 5001  klgates.com

508938408.2

Collectively and put simply, the Purchaser Indemnified Parties have suffered Losses arising from material misrepresentations and fraud relating to the authorship, licensing and ownership of Company software and other key intellectual property. The Subject Claims constitute indemnifiable Losses pursuant to Section 8.1(a) of the Merger Agreement, in each case paid, incurred, suffered or sustained by Purchaser and the Surviving Corporation, as Indemnified Parties with respect to the foregoing.

As you know, pursuant to Section 8.1(a) and Section 8.3(c) of the Merger Agreement, the Holder Indemnifying Parties are obligated to indemnify and hold harmless the Purchaser Indemnified Parties from and against all Purchaser Losses arising out of, or relating to certain matters, including, without limitation, any inaccuracies in or breach of the Company's representations and warranties. As provided in Section 8.5(a) of the Merger Agreement, any limitation on the amount of indemnification payable by any Pre-Closing Holder shall not apply in the event of Fraud by the Company.

While the Purchaser Indemnified Parties' investigation is ongoing, the Purchaser Indemnified Parties state that Purchaser Losses comprising the Subject Claim is an amount in excess of **$5,000,000**. For purposes of this indemnification claim only, Purchaser Indemnified Parties are making an indemnification claim for Purchaser Losses of **$1,681,815** and expressly state and do not waive non-indemnification claims that include and/or are in excess of these amounts.

Purchaser shall seek recourse for the Indemnifiable Amounts as set forth below:

- Forfeiture of Final Payment Amounts (as defined in the Bonus Agreement):                                                                   $200,000

- Surrender of 321,199 Purchaser Closing Shares:                             $131,815

- Forfeiture of Retention Bonus amounts (as defined in the Bonus Agreement):                                                                   $1,350,000

This Indemnification Claim Notice is a Notice of Claim as set out in Section 8.3(c) of the Merger Agreement.

Nothing herein is intended to be, nor should it be construed as, a waiver or limitation of any of the Purchaser Indemnified Parties' rights, claims or defenses in this matter, all of which are and will remain expressly reserved.

If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Ryan Q. Keech



February 7, 2025

Grant J. Thomas
Associate
gthomas@twtlaw.com
(949) 679-6400

**Via Electronic Mail Only**

**To:** Purchaser Indemnified Parties (C/O Ryan Q. Keesh)
K&L Gates
10100 Santa Monica Blvd
Los Angeles, CA 90067
**From:** Grant Thomas on Behalf of Robert Nessler, Holder's Representative for VoiceBite
Corporation Shareholders
**In Re:** Shareholder's Representative's Response to Purchaser Indemnified Parties' Letter
Dated January 29, 2025

Dear Purchaser Indemnified Parties:

This firm has been retained by VoiceBite Corporation to represent VoiceBite Shareholders in
this matter. Robert Nessler, Holder Representative for VoiceBite Corporation, through
undersigned counsel, responds through this letter to the claims made on January 29, 2025 on
behalf of VoiceBite shareholders.

In the letter dated January 29, 2025, Checkmate, Inc. ("Purchaser Indemnified Parties")
makes claims that VoiceBite breached the VoiceBite Merger Agreement "knowingly, willfully and
fraudulently" resulting in significant damages and other losses to purchaser. These losses
allegedly stem from "misrepresentation and fraud relating to the authorship, licensing and
ownership of Company software and other key intellectual property." Based on these
allegations, Purchaser Indemnified Parties identify that Purchaser Indemnified Parties have
been damages in an amount in excess of $5,000,000. There is no factual or legal basis for

these claims, and for that reason VoiceBite disputes the characterizations in the January 29, 2025 letter.

VoiceBite owned all intellectual property identified in the VoiceBite Merger Agreement. VoiceBite's intellectual property was and is free of licenses, including at the time of transfer. VoiceBite is the author of all intellectual property VoiceBite transferred to Checkmate. Therefore, VoiceBite has not made any misrepresentations about ownership of intellectual property, including specifically no misrepresentations for which Purchaser Identified Parties seek indemnification, although none are specifically identified in the January 29, 2025 letter.

VoiceBite has been made aware that Purchaser Indemnified Parties have concerns about ownership of intellectual property based on newly discovered "comments" found in source code. After discussions with VoiceBite personnel, the code at issue was not owned, licensed, or transferred to any third party. Further, this code, to the extent that it is the source of Purchaser Indemnified Parties' claims to which purchaser Indemnified Parties' are seeking indemnification is not capable of being "intellectual property" within the meaning of the VoiceBite merger agreement. The code at issue is merely scènes à faire or API integrations not subject to copyright or intellectual property protection. As the code is functional in nature, the code itself is merely elements dictated by functionality, and therefore cannot be subject to protection and thus are not subject to claims for indemnification based violations of Sections 5.7, 5.9, and 5.19.

Based on the forgoing, Purchaser Indemnified Parties have not established a claim exceeding the amount of $25,000 pursuant to Section 8.1, much less for the losses exceeding $5,000,000 as claimed. To the extent that Purchaser Indemnified Parties wish to invoke the indemnification procedures established by the VoiceBite Indemnification clause, VoiceBite invites Purchaser Indemnified Parties to submit another letter substantiating its claims. Without more information, the indemnification sought by Purchaser Indemnified Parties is barred by Section 8.5 of the VoiceBite Merger Agreement.

If you have an questions or concerns, please contact my firm at gthomas@twtlaw.com or by phone at (949)

Best,


Grant Thomas

# EXHIBIT C

**Exhibit C** – Rule 9(b) Sufficiency Table

## Rule 9(b) Sufficiency Table – Checkmate v. Vasan Amended Complaint

| A¶ | Who | What (Statement) | When | Where | How (Why False/Fraudulent) | Missing Elements |
|---|---|---|---|---|---|---|
| 1-2 | Defendant | "Rode wave of AI interest to peddle recycled code" | Jan 2025 | Nowhere alleged | No details on statement, no context | What, Where, How |
| 3 | Vasan | "Knew technology was recycled, not owned exclusively" | Not alleged | Not alleged | No context for knowledge, no misstatement alleged | When, Where, How |
| 4 | Vasan | "Admitted he knew code was not original; debated disclosure with co-founders" | Not alleged | Not alleged | No quote, no audience, no specific act | When, Where, What, How |
| 16-19 | Vasan | "Represented ownership and authorship of code; made multiple intentional misrepresentations and fraudulent statements" | "Throughout Transaction" (vague) | Not alleged | No direct quote, no recipient, no meeting/context | When, Where, What, How |
| 18 | Vasan | "Was evasive about code review, required to provide reps/warranties" | Not alleged | Not alleged | No act alleged, no specific request or date | When, Where, What, How |
| 19 | Vasan | "Representations were false and known to be false" | Not alleged | Not alleged | No facts showing knowledge or intent | When, Where, How |
| 21-23 | Vasan | "Refused to provide code; contacted competitor, discussed leaving, shared Cyborg code" | Fall 2024, Nov. 7-8, 2024 | Not alleged | No details of what was shared, to whom, why it was false or wrongful | Where, What, How |
| 24-25 | Vasan | "Code dated to 2018, pre-VoiceBite, contained references to Cyborg" | Not alleged | Not alleged | No specific conduct by Vasan, no showing of knowledge or intent | When, Where, How |
| 28 | Vasan | "Did not disclose Varadarajan's role" | Not alleged | Not alleged | No obligation to disclose, no context | When, Where, How |
| 29 | Vasan | "Did not and could not assign code rights" | Not alleged | Not alleged | No showing of what was assigned, or not, or why | When, Where, How |

**Exhibit C** – Rule 9(b) Sufficiency Table

| A¶ | Who | What (Statement) | When | Where | How (Why False/Fraudulent) | Missing Elements |
|---|---|---|---|---|---|---|
| 31-32 | Vasan | "Gave excuses, claimed 'cyborg' use was incidental, said he would get paid 'no matter what'" | Jan 2025, Feb 2025 | Not alleged | No quote showing misrepresentation, no context | Where, What, How |
| 34 | Vasan | "Misrepresentations were knowing, material, and relied on" | Not alleged | Not alleged | Conclusory, no detail | When, Where, What, How |
| 35 | Vasan | "Discussed with cofounders disclosing misrepresentation" | Not alleged | Not alleged | No detail, no misstatement to Checkmate | When, Where, What, How |
| 41, 54, 57, 63 | Vasan | Restates representations/warranties (ownership, originality, exclusivity, etc.) | "Throughout Transaction" (vague) | Not alleged | Merely quotes contract language, not a separate factual statement by Vasan | Who (if more than one signer), When, Where, How |
| 58-60 | Vasan | "Misrepresentations were material, intended to induce, relied on" | Not alleged | Not alleged | Purely conclusory, no facts | When, Where, What, How |

## Chart Highlights

- **Who:** Always refers to Vasan generically, never attributes conduct to other co-founders or specifies what (if anything) was unique about Vasan's knowledge or intent.
- **What:** Rarely provides a direct statement; instead, refers to collective reps/warranties, vague "misrepresentations," or negotiation conduct.
- **When:** "Throughout Transaction," "Spring 2024," "January 2025," "Fall 2024"—always vague, never a date, time, or event.
- **Where:** Never pleads location, context, or medium (meeting, email, phone, Slack, etc.).
- **How:** Fails to allege why a statement was false, what Vasan knew that others didn't, or how Checkmate relied on any particular act or omission.

# EXHIBIT D

**Exhibit D** – Temporal Specificity in the Amended Complaint ("AC")

The table below shows that Plaintiff's AC fails to allege the "when" of the alleged fraud with anything close to the specificity Rule 9(b) demands. Its temporal references are broad, ambiguous, and often post-date the only period relevant to inducement:

## Table: Temporal References in Plaintiff's Amended Complaint

| AC ¶ | Temporal Reference | Quotation (Excerpt) | Specificity/Comment |
|---|---|---|---|
| 2 | "the Transaction closed on April 30, 2024" | "As a result of Defendant's actions, on April 30, 2024, Plaintiff acquired…" | *Only specifies closing date—not when misreps occurred* |
| 5 | "throughout the summer and fall of 2024" | "…throughout the summer and fall of 2024, Vasan engaged in…" | **Vague, includes post-closing** |
| 7 | "throughout the Transaction" | "Throughout the Transaction, Defendant made…" | **Vague, could span months or more** |
| 10 | "early 2024" | "In early 2024, based on multiple representations made by Defendant…" | **Covers several months, not tied to specific act** |
| 11 | "at the outset of the negotiations" | "Beginning at the outset of the negotiations, Defendant represented…" | **Vague, undefined start date** |
| 12 | "in April 2024" | "In April 2024, Checkmate and VoiceBite entered into the Merger Agreement…" | *Specifies when agreement signed* |
| 15 | "prior to closing" | "…Defendant failed to provide Plaintiff with access to the code prior to closing." | **Broad, not tied to event or act** |
| 17 | "recently" | "…He recently claimed to have discussed with his co-founders…" | **Completely vague** |
| 25 | "for months" | "…Defendant refused to provide Plaintiff with access to the code for months." | **No start or end date** |
| 35 | "February 2025" | "…In February 2025, Vasan's excuses shifted yet again…" | **After closing (not inducement)** |
| General | "before closing" | Multiple—"prior to the closing," "before closing" | **General, not tied to any fact** |

**Exhibit D** – Temporal Specificity in the Amended Complaint ("AC")

## Key Observations:

- **"Spring 2024" or indeed the word "Spring" never appears in the AC.**
- No temporal reference is tied to any specific meeting, email, or conversation.
- Many references span pre- and post-closing, pre- and post-termination (especially "throughout the transaction" and "summer/fall 2024").
- Some references (like "February 2025") are actually *after* the closing, making them irrelevant to inducement.
- The only date-specific language (April 30, 2024) refers to the closing, not to when any misrepresentation was made.

# EXHIBIT E

**Exhibit E** – Non-Compete Allegations

1. Checkmate's Motion to Dismiss or Transfer in C.D. Cal. (Dkt. 18)

    A. Agarwal Declaration (Dkt. 18-4)

> 25.  <u>On or around November 7 and 8, 2024, while on leave, Mr. Vasan contacted a competitor of Checkmate to discuss the possibility of joining their company—and bringing two Checkmate engineers with him.</u>  I learned of this breach on November 9, 2024, when I was informed by an industry contact.  <u>Attached hereto as **Exhibit E** is a true and correct copy of Mr. Vasan's email to a competitor.</u>
>
> 26.  On November 14, 2024, Ms. Brown, Mr. Bell, and I met with Mr. Vasan via Zoom to address his actions.  On the same day, after the meeting, Mr. Vasan sent me an email stating that he was resigning.  Attached hereto as **Exhibit F** is a true and correct copy of Mr. Vasan's resignation email.
>
> I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 26th day of March 2025 in New York, New York.



VISHAL AGARWAL

    B. Memorandum of Points and Authorities (Dkt. 18)

| 7 | <u>On or around November 7 and 8, 2024, while on leave, Plaintiff contacted a</u> |
|---|---|
| 8 | <u>competitor of Checkmate to discuss the possibility of joining their company—and</u> |
| 9 | <u>bringing two Checkmate engineers with him.</u>  Agarwal Decl. ¶ 25, Ex. D.  This |
| 0 | conduct was a direct violation of the Non-Competition Agreement.  Agarwal Decl. |
| 1 | ¶¶ 9, 25, Ex. B.  Checkmate learned of this breach on November 9, 2024, when it |

**Exhibit E** – Non-Compete Allegations

## 2. Checkmate's Amended Complaint in S.D.N.Y

> 23.    Knowing he was about to be uncovered, in direct contravention of his non-compete agreement, Vasan began looking to work at a competing company.  On or around November 7 and 8, 2024, Vasan contacted a competitor of Checkmate and mentioned the possibility of leaving Checkmate and bringing two Checkmate engineers along with him in a potential hire by the competitor.  Vasan also shared recordings derived from "Cyborg" technology with the competitor.
>
> -7-

*Figure 1 – SDNY AC ¶ 23*

> 50.    Vasan materially breached the Non-Compete Agreement by, *inter alia*, in November 2024, contacting one or more of Plaintiffs' competitors for the purpose of attempting to solicit interest in acquiring the same code and employees provided to Checkmate as part of the Transaction.

*Figure 2 - SDNY AC ¶ 50*

The emails from the Agarwal Declaration Exhibit E are attached below for convenience.



---

**Fwd: Lunchbox - Voice AI**
1 message

**Vishal Agarwal** <vishal@itsacheckmate.com>                                    Thu, Nov 14, 2024 at 8:24 AM
To: Mike Bell <michaelb@itsacheckmate.com>, Amy Brown <amy.brown@itsacheckmate.com>

FYI



**Vishal Agarwal**
FOUNDER AND CEO

+1 855.953.4340 | itsacheckmate.com

---

---------- Forwarded message ---------
From: **Nabeel Alamgir** <nabeel@lunchbox.io>
Date: Thu, Nov 14, 2024 at 9:43 AM
Subject: Re: Lunchbox - Voice AI
To: <vishal@itsacheckmate.com>

Here you go.



**Nabeel Alamgir**
CEO & Co-founder
C: 646.867.5395
O: 1216 Broadway, NY 10001
Website / LinkedIn / Instagram

Sent via Superhuman iOS

On Fri, Nov 8 2024 at 10:40 AM, Arjun Vasan <arjun.vasan@gmail.com> wrote:

Ok, I figured it's safer to send some older recordings that there is no potential risk.

These are from Cyborg (my earlier company) and from 2021-2022, so the voices themselves are not as nice as we can do now. Though it's pre chatGPT, we were amongst the earliest users of LLMs (GPT-3) for this use case while everyone else was still focused on NLP. We worked with OpenAI directly to train the marco's pizza cart prediction model so we could post fully automatically via API.

Since we didn't have API access for HoF and Lee's sandwiches, those orders were partly automated using RPA on their websites, but used humans to verify.

We sold Cyborg to Presto, but did not transfer IP in the transaction, since we switched over to drive thru there and launched del taco, weinerschnitzel and carls jr.

1. House of Fortune (Chinese Vegan)

 hof-a-good-name.wav

 hof-howdy-john.mp3

2. Lee's sandwiches (Vietnamese banh me) * (attached below)
lees-that-is-impressive.wav

3. Marco's Pizza (4th or 5th largest pizza chain) * (attached below)

Listen thru to the end, and enjoy!

- Arj


Sent from Gmail Mobile


On Thu, Nov 7, 2024 at 7:33 AM Arjun Vasan <arjun.vasan@gmail.com> wrote:
Hey,

Think we connected a while back about voice ordering, then ended up being acquired by Presto, left started another voice ai company, acquired by checkmate.

Let's connect, I'm thinking of leaving here .. the culture doesn't appeal to me .. I've heard good things about lunchbox over the years.

I know you've started in voice - i noticed you were doing some of zalat pizza's phone ordering with a call center. We're also in zalat, with full voice ai.

(We being checkmate, where i'm not happy atm).

1(562)900-6541

I have a short window to decide to leave and nullify my non compete .. like just 2 weeks. And i can bring over 2 additional 10x engineers i recruited here.

- Arj

Sent from Gmail Mobile

Register Now: Virtual Showcase of Lunchbox Catering & CRM - get an inside look at the back-end features that drive $500+ check averages and an exclusive interview with Paris Baguette.



# EXHIBIT F

# STOCK REDEMPTION AGREEMENT

This STOCK REDEMPTION AGREEMENT ("**Agreement**") is entered into as of this 12th day of October, 2021, by and among, Kea Cloud, Inc., a Delaware corporation (the "**Company**") and those individual Stockholders of the Company listed on **Exhibit A** hereto (collectively, the "**Selling Stockholders**").

# R E C I T A L S:

**WHEREAS**, the Selling Stockholders are the record and beneficial owners of that number of shares of Common Stock of the Company, $0.00001 par value per share ("**Common Stock**") as set forth opposite their respective names on **Exhibit A** attached hereto in the column "Current Holdings"; and



**NOW, THEREFORE**, for and in consideration of the Redemption Consideration to be paid by the Company to the Selling Stockholders pursuant to Section 2 below, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Redemption of the Redeemed Shares</u>.  Subject to and in reliance upon the representations and warranties herein set forth, and subject to the terms and conditions herein contained, the Company hereby redeems from the Selling Stockholders, and the Selling Stockholders hereby convey, sell, assign, transfer and deliver to the Company, the Redeemed Shares in the amounts set forth on **Exhibit A** attached hereto.

2.     <u>Payment of Redemption Consideration</u>.  In full consideration for the Redeemed Shares, the Company hereby agrees to pay to the Selling Stockholders in immediately available funds, via wire transfer to an account or accounts designated by the respective Selling Stockholder to the Company, the Redemption Consideration in the amounts set forth on **Exhibit A** attached hereto.

3.     <u>Delivery of Certificates; Stock Powers</u>.  Contemporaneously herewith, the Selling Stockholders will each deliver an executed stock power transferring the digital stock certificates maintained on the Company's cloud based capitalization management platform, Carta, representing the Redeemed Shares in substantially in the form of **Exhibit B** attached hereto.

4.     <u>Redeemed Shares</u>. The Redeemed Shares shall be held by the Company as treasury stock.

5.      Closing.  The closing (the "**Closing**") of the sale and purchase of the Redeemed Shares under this Agreement shall take place on the date hereof through the electronic exchange of deliveries and executed documents as the parties mutually agree (including remotely by exchange of signature pages by facsimile or PDF).

6.      Representations and Warranties of Selling Stockholders.  The Selling Stockholders, severally and not jointly, represent, warrant and covenant to the Company that:

(a)      Valid Title.   The Selling Stockholders own the Redeemed Shares beneficially and of record, free and clear of all liens, mortgages, attachments, claims, encumbrances or other imperfections of title of whatsoever kind.

(b)      Authorization. The execution and delivery of this Agreement by each of the Selling Stockholders, the performance by each of the Selling Stockholders of each of their obligations hereunder and the consummation by the Selling Stockholders of the transactions contemplated hereby have been duly authorized by all requisite action on the part of each of the Selling Stockholders.

7.      Representations and Warranties of the Company.  The Company represents and warrants to the Selling Stockholders that (a) the execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Company, and (b) this Agreement has been duly executed and delivered by the Company.

8.      Seller Stockholders Release; Covenant Not to Sue.  Each Selling Stockholder, on his own behalf, and for all of such Selling Stockholder's affiliates (other than the Company) and each of their predecessors, successors, assigns, next of kin, representatives, administrators, executors, agents and any other person claiming by, through, or under any of the foregoing (each, a "**Related Party**") does hereby irrevocably and unconditionally release, acquit and forever discharge (the "**Release**") the Company's other stockholders, the Company and each of their affiliates, and each of their past, present, and future, direct and indirect, affiliates, parent entities, subsidiaries, divisions, joint ventures, equityholders, principals, directors, managers, partners, general partners, limited partners, officers, employees, trustees, insurers, attorneys, agents and representatives, and each of their predecessors, successors, assigns, next of kin, representatives, administrators, executors, agents and any other person claiming by, through, or under any of the foregoing (individually, a "**Releasee**" and, collectively, the "**Releasees**") of and from all claims, demands, causes of action, actions, suits, proceedings, fees, costs, debts, sums of money, damages or liabilities of every kind or nature, whether known or unknown, suspected or unsuspected, whether arising in law or equity (collectively, "**Actions**"), arising out of or relating to, directly or indirectly, by reason of any act, omission, matter, cause, circumstance, event or other transaction occurring on or prior to the date hereof, including by reason of the Selling Stockholder's ownership of the Redeemed Shares and with respect to any matter, including (without limitation) any matter related to each Selling Stockholder's employment with the Company or the termination of that employment, including (without limitation) claims to attorneys' fees or costs, claims of wrongful discharge, constructive discharge, emotional distress, defamation, invasion of privacy, fraud, breach of contract or breach of the covenant of good faith and fair dealing and any claims of discrimination or harassment based on sex, age, race, national origin, disability or any other basis under Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act, the California Family Rights Act, the California Fair Pay Act, the Equal Pay Act, the Age Discrimination in Employment Act of 1967,

the Older Workers Benefit Protection Act, the Americans with Disabilities Act, the National Labor Relations Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act of 1974, as amended, and all other laws and regulations relating to employment (the "**Causes of Action**"); provided, however, that the Causes of Action shall not include any rights or claims by such Releasee arising from or under this Agreement, the exhibits hereto and any certificates or other instruments contemplated hereby or thereby. The Selling Stockholders understand that this is a full and final general release of any Causes of Actions that could have been asserted against any Releasee. Each Related Party does hereby irrevocably covenant to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any judicial, quasi-judicial or arbitral proceeding of any kind against any Releasee, based upon any Causes of Action. Excluded from the Causes of Action are any claims which cannot be waived by law.

9.    Company Release; Covenant Not to Sue. The Company does hereby irrevocably and unconditionally release, acquit and forever discharge each Selling Stockholder generally from all claims, demands, debts, damages and liabilities of every name and nature, known or unknown that the Company ever had, claim to have or ever claimed to have had against each Selling Stockholder, including without limitation, claims arising out of or in relation to such Selling Stockholder's employment by the Company (the released claims, the "**Company Released Claims**"). Excluded from the Company Released Claims are any claims which cannot be waived by law. The Company represents that it has not filed, has not caused to be filed, and will not cause to be filed, against a Selling Stockholder, any action or legal proceeding in any court or any administrative agency concerning any matter involving the Company Released Claims. The Company further agrees that it shall not seek or accept damages of any nature, other equitable or legal remedies for its own benefit or for the benefit of its affiliates, attorney's fees, or costs from a Selling Stockholder with respect to any Company Released Claim. As a material inducement to each Selling Stockholder to enter into this Agreement, the Company represents that, it has not assigned to any third party and it has not filed with any agency or court any Company Released Claim.

10.    Civil Code Section 1542. Each of the parties to the release made under this Agreement understands and expressly waives any rights or benefits available to it under Section 1542 of the Civil Code of California or any similar law of any other jurisdiction. Section 1542 provides:

"CIVIL CODE 1542: 'A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HER MUST HAVE MATERIALLY AFFECTED HER SETTLEMENT WITH THE DEBTOR."

Each party to this Agreement understands and acknowledges that the significance and consequence of this waiver of California Civil Code Section 1542 and any other analogous statutes or common law principles with a similar effect is that even if such party or his/its attorneys or agents discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the subject matter of this Agreement such that such party should eventually suffer additional damages, such party will not be able to make any claim for those damages. Furthermore, each party to this Agreement acknowledges that such party intends these consequences even as to claims for damages that may exist as of the date hereof but of which such party is unaware and which, if known, would materially affect such party's decision to execute this Agreement, regardless whether such lack of knowledge is the result of ignorance, oversight, error, negligence or any other cause.

11.     Termination of TAA.  The Company and Arjun Vasan ("**Vasan**") agree that the Technology Assignment Agreement between Vasan and the Company, dated January 1, 2019 (the "**TAA**") is hereby rescinded and null and void.  Any assignment of Intellectual Property and Technology (each as defined in the TAA) is ineffective and rescinded.  The parties hereby grant each other a mutual, non-exclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license, with the right to grant and authorize sublicenses, to make, have made, modify, use, import, offer for sale, and sell the Intellectual Property and Technology that was purportedly assigned via the TAA.

12.     Miscellaneous.

(a)     Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

(b)     Survival of Representations and Warranties.  All agreements, representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Closing.

(c)     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(d)     Governing Law.  This Agreement shall be deemed to have been executed and delivered within the State of California, and it shall be construed, interpreted, governed, and enforced in accordance with the laws of the State of California, without regard to conflict of law principles. Each party hereby consents to personal and exclusive jurisdiction and venue in the state courts located in San Francisco, California and the federal courts located in the Northern District of California with respect to any disputes arising out of and in relation to this Agreement.

(e)     Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or:  (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at their address as set forth on the signature page attached hereto or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this.

(f)     Entire Agreement. This Agreement (including the Exhibits hereto) and the documents referenced herein constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect hereto and thereto, except as otherwise set forth in this Agreement.  Except as expressly set forth in this Agreement, this Agreement shall supersede, cancel, and serve as a novation of all oral or written contracts, agreements, and

understandings of the parties dated prior to the date hereto. Notwithstanding the foregoing, that certain Indemnification Agreement between Vasan and the Company, dated January 1, 2019, shall remain in effect.

       (g)   <u>Amendments and Waivers</u>. Any term of this Agreement may be amended or waived by the unanimous written consent of the parties hereto.

       (h)   <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same document. This Agreement may be executed by facsimile signatures.

       (i)   <u>Section Headings</u>. The section headings are for the convenience of the parties and in no way alter, modify, amend, limit, or restrict the contractual obligations of the parties.

       (j)   <u>Specific Enforcement</u>. It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any other party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

       (k)   <u>Cost of Enforcement</u>. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against any other party to this Agreement, the non-prevailing party or parties named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party or parties, including, without limitation, all reasonable attorneys' fees.

       (l)   <u>Expenses</u>. Each party hereto shall pay its own expenses.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date set forth above.

**COMPANY**:

**KEA CLOUD, INC.**

By:_____

Name:  Adam Ahmad

Title:    Chief Executive Officer

Address:

101 Avellino Way

Mountain View, CA 94043

Email:  adam@kea.ai

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date set forth above.

**SELLING STOCKHOLDERS**:

_____

Arjun Vasan

Address:

12615 193rd Street
Cerritos, CA 90703
Email: _____

        IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date set forth above.

**SELLING STOCKHOLDERS:**

_____

Robert Nessler

Address:


_____

_____

Email: _____

**SIGNATURE PAGE TO STOCK REDEMPTION AGREEMENT**